918 So.2d 250 (2005)
FLORIDA DEPARTMENT OF REVENUE, Appellant,
v.
The CITY OF GAINESVILLE, Appellee.
No. SC03-2273.
Supreme Court of Florida.
December 8, 2005.
*252 Charles J. Crist, Jr., Attorney General, Chirstopher M. Kise, Solicitor General, Louis Hubener, III, Nicholas Bykowsky and Mark T. Aliff, Assistant Attorneys General, Tallahassee, FL, for Appellant.
Robert Pass and E. Kelly Bittick, Jr. of Carlton Fields, P.A., Tallahassee, FL, for Appellee.
Sherri L. Johnson and John C. Dent, Jr. of Dent and Associates, P.A., Sarasota, Fl, on behalf of Ed Crapo.
Larry E. Levy and Loren E. Levy of the Levy Firm, Tallahassee, FL, on behalf of Property Appraisers' Association of Florida, Inc.
John R. Beranek, Kenneth R. Hart, and Jason B. Gonzalez of Ausley and McMullen, Tallahassee, FL, on behalf of Florida Telecommunications Industry Association, for Amici in support of Appellant.
James Baller and Sean A. Stokes of The Baller Herbst Law Group, P.C., Washington, D.C. and William J. Peebles, Tallahassee, FL, on behalf of Florida Municipal Electric Association, for Amicus in support of Appellee.
PARIENTE, C.J.
In this case, we review a decision holding unconstitutional a law that requires payment by a municipality of ad valorem taxes on property owned and used exclusively by the municipality to provide telecommunications *253 services to the public. See Dep't of Revenue v. City of Gainesville, 859 So.2d 595 (Fla. 1st DCA 2003). The applicable provision in our state constitution provides that "[a]ll property owned by a municipality and used exclusively by it for municipal or public purposes shall be exempt from taxation." Art. VII, § 3(a), Fla. Const. We have mandatory jurisdiction. See art. V, § 3(b)(1), Fla. Const. Because we conclude that providing telecommunications services does not as a matter of law always serve municipal or public purposes, ad valorem taxation of a municipality's telecommunications facilities is not facially unconstitutional. In reaching this conclusion, we do not dispute that telecommunications services are essential services. Rather, we make the narrower determination that in providing these services, regardless of circumstances such as the availability of the same services through other providers, a municipality does not as a matter of law engage in an activity essential to the welfare of the community. We therefore reverse the decision of the First District Court of Appeal holding the statutory provisions imposing ad valorem taxation on these telecommunications facilities facially unconstitutional.

I. FACTS AND PROCEDURAL HISTORY
As part of the nationwide transition from single-provider telecommunications services to a competitive marketplace, the Florida Legislature enacted legislation in 1995 authorizing governmental entities including municipalities to sell two-way telecommunications services to the public. See § 364.02(12), Fla. Stat. (1995) (defining "telecommunications company" to include "every political subdivision in the state offering two-way telecommunications service to the public for hire within this state by the use of a telecommunications facility"). However, in 1997 the Legislature made that authority conditional upon payment of ad valorem taxes or equivalent fees on facilities used to provide the telecommunications services. See ch. 97-197, § 2, at 3738-42, Laws of Fla.[1] Section 2 of the 1997 enactment created section 166.047, Florida Statutes (1997), which provides in pertinent part:
166.047 Telecommunications services.A telecommunications company that is a municipality or other entity of local government may obtain or hold a certificate required by chapter 364, and the obtaining or holding of said certificate serves a municipal or public purpose under the provision of s. 2(b), Art. VIII of the State Constitution, only if the municipality or other entity of local government:
....
(3) Notwithstanding any other provision of law, pays, on its telecommunications facilities used to provide two-way telecommunications services to the public for hire and for which a certificate is required pursuant to chapter 364, ad valorem taxes, or fees in amounts equal thereto, to any taxing jurisdiction in which the municipality or other entity of local government operates. Any entity of local government may pay and impose such ad valorem taxes or fees.
(Emphasis supplied.) In other words, the Legislature conditioned the grant of the power to obtain or hold a certificate from the Public Service Commission (PSC) for operation of a telecommunications facility on the municipality's payment of ad valorem *254 taxes, and specified that payment of the taxes is necessary for the facility to serve a public purpose under the municipal powers clause of the Constitution.[2]
In the same act, the Legislature amended section 196.012(6), Florida Statutes (1995), to exclude the telecommunications services authorized in section 166.047 from the statutory ad valorem tax exemption for municipally owned property "used for governmental, municipal or public purposes" contained in section 196.199(1)(c), Florida Statutes (1995). See ch. 97-197, § 3, Laws of Fla.[3] The pertinent portion of section 196.012(6), as amended, specifies that "[p]roviding two-way telecommunications services to the public for hire by the use of a telecommunications facility, as defined in s. 364.02(13), and for which a certificate is required under chapter 364 does not constitute an exempt use for purposes of s. 196.199," with exceptions inapplicable here. § 196.012(6), Fla. Stat. (1997).
The amended provisions operate in tandem. Section 166.047(3) invokes the municipal powers provision of the state constitution to mandate ad valorem taxation, and the amendment to section 196.012(6) disqualifies municipally owned and operated telecommunications facilities from a statutory ad valorem tax exemption for municipal property. The purpose and effect of this legislation is to make property owned and used by a municipality for a telecommunications business subject to ad valorem property taxation. See Fla. H.R. Comm. on Util. & Comm., CS for CS for HB 313 (1997) Staff Analysis 1 (July 1, 1997) (on file with Comm.) (stating that chapter 97-197 "removes the exemptions that municipalities, counties, or other entities of local government have on ad valorem taxes on property used for the purpose of providing telecommunications services to the public").
The City of Gainesville (the City), operating under the fictitious name Gainesville Regional Utilities, acquired certificates from the PSC to operate as a public telecommunications provider. The City then began selling communications infrastructure and integrated telecommunications services to the public, charging contractually agreed-upon rates. Under the service agreements with the City, customers do not have any leasehold interest in the City's telecommunications property.[4] The City uses a fiber-optic network to provide private line service and special access service for the transmission of voice, data, and video.
*255 In its 1995 base planning study, the City stated that "[n]o substantial communication services competition appears to be emerging in Gainesville," and asserted that "[i]f the citizens of Gainesville are to be provided with all of the benefits which will be possible through the National Information Superhighway at a reasonable price, a major independent investor will need to assume a role in shaping the communications environment." The City anticipated that its telecommunications business would make it both a provider of services and a promoter for the entry of new service providers. The City stated in its 1995 start-up business plan that its "overall business activities" would benefit the local economy by creating competition in what it termed a "monopoly market," producing additional revenues for the City, and keeping profits within the community. In its pleadings in this case, the City specified that by 2000, it had invested approximately $10 million in infrastructure and equipment.
In 2000, the City filed suit seeking a declaration that the portions of chapter 97-197 imposing the tax obligation on its telecommunications facilities are unconstitutional under article VII, section 3(a). The trial court granted summary judgment in favor of the City and declared sections 2 and 3 of chapter 97-197 facially unconstitutional. The First District affirmed, holding that "the property in question is being used by the City for a municipal purpose and the legislature's attempt to condition the provision of these municipal services on the payment of an amount equal to any ad valorem tax liability is in direct conflict with Article VII, Section 3(a) of the Florida Constitution." Dep't of Revenue, 859 So.2d at 597. Judge Ervin dissented, concluding that the amendments "are a proper exercise of the legislature's discretion to classify real property for ad valorem taxation." Id. at 601 (Ervin, J., dissenting).

II. ANALYSIS
Article VII, section 4 of the Florida Constitution requires a "just valuation of all property for ad valorem taxation," with exceptions that do not apply here.[5] However, governmentally owned property is generally excluded from taxation, through either immunity or exemption. An exemption presupposes an ability to tax, whereas an immunity implies the absence of that ability. See Greater Orlando Aviation Auth. v. Crotty, 775 So.2d 978, 980 (Fla. 5th DCA 2000). The state and counties are immune from taxation. See Canaveral Port Auth. v. Dep't of Revenue, 690 So.2d 1226, 1228 (Fla.1996); Park-N-Shop, Inc. v. Sparkman, 99 So.2d 571, 573 (Fla.1957). Unlike counties, municipalities are not subdivisions of the state and are therefore subject to taxation absent an exemption. See Greater Orlando Aviation Auth., 775 So.2d at 980.
Article VII, section 3(a) of the Florida Constitution confers on property owned by municipalities an exemption from ad valorem taxation under certain circumstances. To qualify for the exemption in article VII, section 3(a), the property must be both owned by a municipality and used exclusively by the municipality for municipal or public purposes.
In this case, the parties' arguments generally reflect the majority and dissenting opinions below. In accord with the First District majority, the City asserts that chapter 97-197 on its face violates article VII, section 3(a) by targeting for taxation property that is used by a municipality exclusively for the "municipal or public purposes" of providing telecommunications services to residential and business customers *256 within the municipality. The Department of Revenue, relying on Judge Ervin's dissent and precedent holding leasehold interests in municipal property ineligible for the constitutional exemption, argues for a narrower construction of "municipal or public purposes" that would exclude a municipality's telecommunications business that competes with the private sector for customers.
The determination of a statute's constitutionality and the interpretation of a constitutional provision are both questions of law reviewed de novo by this Court. See Zingale v. Powell, 885 So.2d 277, 280 (Fla.2004). "While we review decisions striking state statutes de novo, we are obligated to accord legislative acts a presumption of constitutionality and to construe challenged legislation to effect a constitutional outcome whenever possible." Florida Dept. of Revenue v. Howard, 916 So.2d 640, 642 (Fla. 2005). Further, a determination that a statute is facially unconstitutional means that no set of circumstances exists under which the statute would be valid. See State v. Bales, 343 So.2d 9, 11 (Fla.1977); Cashatt v. State, 873 So.2d 430, 434 (Fla. 1st DCA 2004).
In Zingale, in which we were called upon to construe a constitutional provision limiting increases in annual tax assessments of homestead property, we recognized that "[o]ur task in this case of constitutional interpretation follows principles parallel to those of statutory interpretation." 885 So.2d at 282. We reiterated from our prior precedent that
"[a]ny inquiry into the proper interpretation of a constitutional provision must begin with an examination of that provision's explicit language." Likewise, this Court endeavors to construe a constitutional provision consistent with the intent of the framers and the voters. ...
The fundamental object to be sought in construing a constitutional provision is to ascertain the intent of the framers and the provision must be construed or interpreted in such manner as to fulfill the intent of the people, never to defeat it. Such a provision must never be construed in such manner as to make it possible for the will of the people to be frustrated or denied.
... Moreover, in construing multiple constitutional provisions addressing a similar subject, the provisions "must be read in pari materia to ensure a consistent and logical meaning that gives effect to each provision."
Id. at 282-83 (citations omitted) (quoting Caribbean Conservation Corp. v. Fla. Fish & Wildlife Conservation Comm'n, 838 So.2d 492, 501 (Fla.2003)). Although we have held that statutory provisions granting tax exemptions should be strictly construed, this rule of construction does not apply to exemptions claimed by municipalities. See State ex rel. Green v. City of Pensacola, 126 So.2d 566, 569 (Fla.1961).
The facial constitutionality of the statute imposing a tax obligation on municipally owned and operated telecommunications facilities hinges on whether providing two-way telecommunications services to the public always serves "municipal or public purposes" as contemplated in article VII, section 3(a). If so, the property used exclusively by a municipality to provide these services cannot be taxed, and the legislation requiring payment of taxes on the property as a condition of operation is unconstitutional on its face.
The term "municipal or public purposes" is not defined in article VII, section 3(a). Although "governmental, municipal, or public purpose or function" is statutorily defined in section 196.012(6), Florida *257 Statutes (2004),[6] which also concerns tax exemptions for governmentally owned property, "[a] reading of section 3(a) of article VII clearly establishes that it is a self-executing provision and therefore does not require statutory implementation." City of Sarasota v. Mikos, 374 So.2d 458, 460 (Fla.1979). Therefore, the statutory definition does not control the construction of the term "municipal or public purposes" in the constitutional provision. In addition, the statutory definition in section 196.012(6) applies only to property leased from governmental entities.
Article VII, section 3(a) was adopted in the 1968 revision to the Florida Constitution. To place this provision in historical perspective, we explore its antecedent provisions in the Florida Constitution of 1885, which also provided an exemption from ad valorem taxation for property used for "municipal purposes." Then we discuss the adoption of article VII, section 3(a) and precedent interpreting and applying that provision. Next we compare the definition of "municipal and public purposes" in article VII, section 3(a) with the definition of "municipal purposes" used in applying article VIII, section 2(b), which governs municipal powers. Finally, we specify how the term "municipal or public purposes" is to be defined in construing the ad valorem tax exemption for property owned and used exclusively by a municipality, and apply that definition in determining whether chapter 97-197 is facially constitutional.

A. Tax Exemptions for Property Used for Municipal Purposes Under the 1885 Constitution
Before the 1968 revision, tax exemptions for property used for municipal purposes were covered in two different constitutional provisions:
The Legislature shall provide for a uniform and equal rate of taxation, ... and shall prescribe such regulations as shall secure a just valuation of all property, both real and personal, excepting such property as may be exempted by law for municipal, educational, literary, scientific, religious, or charitable purposes.

Art. IX, § 1, Fla. Const. (1885) (emphasis supplied).
The property of all corporations ... shall be subject to taxation unless such property be held and used exclusively for religious, scientific, municipal, educational, literary, or charitable purposes.

Art. XVI, § 16, Fla. Const. (1885) (emphasis supplied).[7] Article IX, section 1 differed from article XVI, section 16 in that the former provision was not limited solely to corporations, and the property did not have to be held exclusively for the listed purposes. See State ex rel. Cragor Co. v. *258 Doss, 150 Fla. 486, 8 So.2d 15, 16 (1942). In its use of the term "as may be exempted by law," article IX, section 1 was not self-executing, and therefore a tax exemption under that provision required legislative authorization. See Rast v. Hulvey, 77 Fla. 74, 80 So. 750, 752 (1919). Shortly before these provisions were supplanted by the 1968 Constitution, this Court held that article XVI, section 16 was also not self-executing. See Jasper v. Mease Manor, Inc., 208 So.2d 821, 825 & n. 5 (Fla.1968) (receding from Lummus v. Miami Beach Congregational Church, 142 Fla. 657, 195 So. 607 (1940)).
In the few cases in which this Court was expressly called upon to construe the "municipal purposes" exemptions in the 1885 Constitution, we deferred to the Legislature. In State ex rel. Harper v. McDavid, 145 Fla. 605, 200 So. 100 (1941), a taxpayer challenged an exemption for property owned by a city housing authority and used for a low-rent housing and slum clearance project. The Legislature had authorized municipalities to erect low-rent housing units and exempted them from ad valorem taxation by declaring that they served municipal purposes. See id. at 101. This Court upheld the tax exemption against challenges under both article IX, section 1 and article XVI, section 16 of the 1885 Constitution. See id. at 101-02. The Court noted that it had previously "conceded power in the legislature to define a municipal purpose as contemplated by the provisions of the Constitution alluded to." Id. at 102. Responding to the claim that providing low-rent housing did not serve a valid municipal purpose, the Court stated:
It is contended that the business of the Housing Authority is in no sense municipal, that it is in direct competition with private enterprise and even though declared by the legislature to be strictly municipal and charitable, its properties should not be exempt from taxation and that any attempt to make them so should be held in violation of the Constitution.
What constituted a municipal purpose is a legislative question that should not be interfered with by the courts in the absence of a clear abuse of discretion. A municipal purpose is much broader in its scope than it was a generation ago. Under our system of jurisprudence, constitutional validity may be determined by practical operation and effect. Measured by this test, we cannot say that the legislature exceeded its power in pronouncing the properties of the Housing Authority held for a municipal purpose free from all forms of taxation. They are held not for profit, must be restricted to a low income group, and contribute materially to the health, morals, safety, and general welfare of the people. They aid materially in reducing the cost of fire prevention and police protection and the Housing Authority is authorized to make annual compensation to the City in lieu of taxes and other services furnished. There is no suggestion that the officers charged with the administration of the present scheme have failed in their duty and being so, we must assume that the law has been faithfully observed.
The time was when a municipal purpose was restricted to police protection or such enterprises as were strictly governmental but that concept has been very much expanded and a municipal purpose may now comprehend all activities essential to the health, morals, protection, and welfare of the municipality.

Id. (emphasis supplied).
Five years later, this Court relied on the same definition in holding that electric light poles and other properties held and used by a city to supply electric power to *259 customers in an adjacent county could not be taxed by that county under article IX, section 1 of the 1885 Constitution. See Saunders v. City of Jacksonville, 157 Fla. 240, 25 So.2d 648, 649 (1946). The Legislature had exempted from ad valorem taxation property owned by a municipality's public utility but located in a different county. See id. The Court concluded that furnishing electric current served a municipal purpose. As in McDavid, we explicitly rejected the claim that the exemption was invalid "because it might enable the City to compete with private utilities required to pay taxes," again deferring to the Legislature's judgment "as the arbiter of this question." Id. at 650.[8] The Court held that "[i]t is a controlling factor that the owner of the property has no stockholders, or partners, and any income must necessarily accrue to the general public." Id. at 651.
McDavid and Saunders demonstrate that in applying the non-self-executing provisions of the 1885 Constitution, this Court deferred to the Legislature's authorization of municipal functions and clear intention to exempt property used therefor from ad valorem taxation. Further, we held that a municipal purpose could be served even though the activity was one that competed with the private sector, if the Legislature determined that the activity was essential to the welfare of the municipality. The Court accepted the Legislature's determination that providing low-income housing and electrical power to those in need were "essential" municipal services.

B. Tax Exemptions for Municipal Use of Municipal Property Under the 1968 Constitution
The 1968 constitutional revision effected changes in the exemption from ad valorem taxation for property used for municipal purposes. Unaltered since its adoption in 1968, article VII, section 3(a) provides in full:
All property owned by a municipality and used exclusively by it for municipal or public purposes shall be exempt from taxation. A municipality, owning property outside the municipality, may be required by general law to make payment to the taxing unit in which the property is located. Such portions of property as are used predominantly for educational, literary, scientific, religious or charitable purposes may be exempted by general law from taxation.
This provision differs from its antecedents in the 1885 Constitution in two significant ways. First, as stated above, it does not require legislative authorization to activate the self-executing exemption for property owned and used exclusively by the municipality for municipal or public purposes. In other words, no longer was the exemption contingent upon the Legislature declaring that an activity served a municipal purpose and was therefore tax exempt. See Mikos, 374 So.2d at 460 (holding change in statutory language on exemption irrelevant because provision is self-executing "and therefore does not require statutory implementation"); see generally 2 Tax Section, The Florida Bar, Florida State and Local Taxes, ¶ 5.03[4], at 215 (1984) (describing exemption in article VII, section 3(a) as "unique, ... mandatory and self-executing").
Second, the self-executing exemption requires use of the property by the municipality that owns it, whereas article XVI, section 16 of the 1885 Constitution did not require ownership and use by the municipality *260 as long as the property was "held and used exclusively" for municipal purposes. A tax exemption for portions of property used "predominantly" for municipal purposes, regardless of ownership, still requires legislative authorization under the express terms of article VII, section 3(a).
The requirement that the property be both owned and used exclusively by the municipality was seen as a response to the 1965 decision in Daytona Beach Racing & Recreational Facilities District v. Paul, 179 So.2d 349, 353 (Fla.1965), holding that municipal property leased to a corporation for a racetrack served a public purpose because it contributed to the economic well-being of the community, rendering the lessees' interest in the property exempt from ad valorem taxation. See Volusia County v. Daytona Beach Racing & Recreational Facilities Dist., 341 So.2d 498, 501 (Fla.1976) ("Perceiving decisions [such as Daytona Beach Racing] as creating inequities in the tax structure, the draftsmen of the Constitution of 1968 limited the municipal purpose exemption to `property owned by a municipality and used exclusively by it for municipal or public purposes.'"); Bonnie Roberts, Ad Valorem Taxation of Leasehold Interests in Governmentally Owned Property, 6 Fla. St. U.L.Rev. 1085, 1091-92 (1978) (stating that Daytona Beach Racing "dealt a substantial blow to the legislature's attempt to tax leasehold interests," and that the drafters of the 1968 Constitution "attempted to deal with the problem by limiting the constitutional grounds on which an exemption could be based").
Effectuating the intent of the framers and voters, we held in Volusia County that property leased from a municipality and used to generate a profit was not exempt from ad valorem taxation under article VII, section 3(a). See 341 So.2d at 502 (stating that the corporation's use of the leasehold on governmental property to make profits for its stockholders is "determinative"). The decision in Volusia County marked one step in a series of cases in which this Court developed a separate and more restrictive test under article VII, section 3(a) for private interests in municipal property. Under this test, a tax exemption is constitutionally permitted only if the use by the private entity "could properly be performed or served by an appropriate governmental unit, or which is demonstrated to perform a function or serve a purpose which would otherwise be a valid subject for the allocation of public funds." Sebring Airport Auth. v. McIntyre, 783 So.2d 238, 246-48 (Fla.2001) (quoting Roberts, supra, at 1092). In Sebring Airport Authority we applied this standard, known as the "governmental-governmental" test, to invalidate a statutory tax exemption granted under section 196.012(6) for profitmaking endeavors such as convention and visitor centers, sports facilities, concert halls, arenas and stadiums. We have also applied the "governmental-governmental" test to uphold ad valorem taxation of property leased from an airport authority by food, drink, and merchandise vendors,[9] as well as property leased from a governmental authority for both residential and commercial uses.[10]Sebring Airport Authority ultimately established that for private leaseholds of municipal property, the "governmental-governmental test" governs eligibility for the constitutional tax exemption in article VII, section 3(a). See 783 So.2d at 248 ("Pursuant to this `governmental-governmental' standard, article VII, section 3(a) does not permit municipal property leased to private entities for governmental-proprietary activities to be tax exempt.").
*261 Our review of the history of article VII, section 3(a) and the pertinent case law demonstrates that the test for private interests in municipally owned property was never intended to apply to property both owned and used exclusively by a municipality for municipal or public purposes. For property both owned and used exclusively by the municipality, the question becomes whether "municipal or public purposes" under article VII, section 3(a) of the 1968 Constitution is as broad as "municipal purposes" under the corresponding provisions of the 1885 Constitution as interpreted in decisions such as McDavid and Saunders.
As discussed above, article VII, section 3 does not provide a definition of "municipal or public purposes," just as its antecedent provisions in the 1885 Constitution did not define "municipal purposes." The 1968 provision added the term "public purposes," but this addition neither broadened nor narrowed the exemption. This Court had previously held that "public purposes," the term specified in a statutory tax exemption for governmental property, was synonymous with "municipal purposes." See Daytona Beach Racing, 179 So.2d at 353; Gwin v. City of Tallahassee, 132 So.2d 273, 276 (Fla.1961). Thus, although the framers of article VII, section 3(a) sought to limit the holding in Daytona Beach Racing, they did so by requiring both ownership and exclusive use of the property by the municipality rather than by narrowing the definition of municipal purposes.
In our decisions since 1968 on tax exemptions under article VII, section 3(a) for property both owned and used exclusively by a municipality, we have not elaborated on the meaning of "municipal or public purposes." In Ford v. Orlando Utilities Commission, 629 So.2d 845, 846 (Fla.1994), this Court concluded that property located outside Orlando but owned and used by the city for an electrical power plant was used for a valid municipal purpose. We held that under the "clear and unambiguous language" of article VII, section 3(a), the property was exempt from taxation. Id. at 847.[11] In Mikos, we held that property owned and held as open space or reserved for future needs was constitutionally exempt from ad valorem taxation under article VII, section 3(a). See 374 So.2d at 460. This Court recognized that "property owned by a municipality is not exempt from taxation if it is used for a private purpose," but held that "vacant land held by a municipality is presumed to be in use for a public purpose if it is not actually in use for a private purpose on tax assessment day." Id. at 460-61.[12]

C. "Municipal Purposes" Under Article VIII, Section 2(b)
The City asserts that "municipal or public purposes" should receive the *262 same broad construction as "municipal purposes" under article VIII, section 2(b) of the Florida Constitution, which prescribes municipal powers. Adopted in the same 1968 revision as article VII, section 3(a), article VIII, section 2(b) provides in pertinent part:
Municipalities shall have governmental, corporate and proprietary powers to enable them to conduct municipal government, perform municipal functions and render municipal services, and may exercise any power for municipal purposes except as otherwise provided by law.
(Emphasis supplied.) Under this provision, municipalities have "inherent power to meet municipal needs," and the "legislature's retained power is ... one of limitation." Lake Worth Utils. Auth. v. City of Lake Worth, 468 So.2d 215, 217 (Fla.1985). Previously, "municipalities were inherently powerless, absent a specific grant of power from the legislature." Id. We recognized the broad sweep of municipalities' inherent power under article VIII, section 2(b) in State v. City of Sunrise, 354 So.2d 1206 (Fla.1978), where we stated:
Article VIII, Section 2, Florida Constitution, expressly grants to every municipality in this state authority to conduct municipal government, perform municipal functions, and render municipal services. The only limitation on that power is that it must be exercised for a valid "municipal purpose." It would follow that municipalities are not dependent upon the Legislature for further authorization. Legislative statutes are relevant only to determine limitations of authority.
Id. at 1209; see also City of Ocala v. Nye, 608 So.2d 15, 17 (Fla.1992) (reiterating "municipal purposes" requirement from City of Sunrise as only constitutional limitation on municipal power).
In City of Boca Raton v. Gidman, 440 So.2d 1277, 1281 (Fla.1983), this Court held that providing day care educational facilities is a valid municipal purpose under article VIII, section 2(b). We stated that we would accept the Legislature's determination that an activity served a municipal purpose absent an abuse of discretion. See id. at 1280. The Court also noted that the term "municipal purposes" had been broadly interpreted and included such activities as maintenance and operation of a radio broadcasting system by a municipality, citing to State v. City of Jacksonville, 50 So.2d 532 (Fla.1951). Gidman, 440 So.2d at 1280. City of Jacksonville concerned validation of revenue certificates to finance a municipally owned and operated radio station. There this Court employed the same definition of municipal purpose as in McDavid and Saunders, the two pre-1968 tax exemption cases, stating that "[t]hough there was a time when a municipal purpose was restricted to police protection or such enterprises as were strictly governmental that concept has been very much expanded and a municipal purpose may now comprehend all activities essential to the health, morals, protection and welfare of the municipality." City of Jacksonville, 50 So.2d at 535.
Unfortunately, the language in some of these cases has been imprecise. See Gidman, 440 So.2d at 1281 (defining a municipal purpose as being "rationally related to the health, morals, protection and welfare of the municipality") (emphasis supplied); Basic Energy Corp. v. Hamilton County, 652 So.2d 1237, 1239 (Fla. 1st DCA 1995) (defining municipal purpose under article VIII, section 2(b) as "one that is related to the health, morals, safety, protection or welfare of the municipality") (emphasis supplied). Therefore, we specifically distinguish precedent construing article VIII, section 2(b), which uses language that is *263 overly broad for determining eligibility for the ad valorem tax exemption in article VII, section 3(a).
There is another reason to conclude that the precedent construing "municipal purposes" under article VIII, section 2(b) is of limited use in construing article VII, section 3(a). As stated above, prior to the adoption of the 1968 Constitution, the Legislature had complete discretion to prescribe municipal powers. Thus, the legislative determination that operation of a radio station, parking garage, or public auditorium served a municipal or public purpose was largely unchecked, absent an abuse of discretion. See Gate City Garage, Inc. v. City of Jacksonville, 66 So.2d 653 (Fla.1953) (parking facility); Starlight Corp. v. City of Miami Beach, 57 So.2d 6 (Fla.1952) (auditorium); City of Jacksonville, 50 So.2d at 535 (radio station). The Court was unwilling to hold that the Legislature abused its discretion in determining that a municipal project that it had authorized served a public purpose.
The precedent discussed above shows that this broad construction of municipal powers remains in force under article VIII, section 2(b), in which the Legislature's remaining authority is to limit, rather than authorize, municipal powers. In fact, the only restriction we have placed on the exercise of municipal powers for a municipal purpose under article VIII, section 2(b) is to hold that "borrowing money for the primary purpose of reinvestment is not a valid municipal purpose." State v. City of Orlando, 576 So.2d 1315, 1317 (Fla.1991).
Because the definition of "municipal purposes" applied under article VIII, section 2(b) has been imprecise, and because that provision and article VII, section 3(a) serve different functions, we conclude that not every municipal activity that the Legislature either declined to prohibit after the 1968 revision, or had authorized in older cases relied upon in construing the 1968 municipal powers provision, was intended to also qualify for the constitutional ad valorem tax exemption in article VII, section 3(a). Thus, an activity may serve valid "municipal purposes" under article VIII, section 2(b) and constitute a permissible municipal function, but not serve "municipal or public purposes" under article VII, section 3(a) making the property owned by the municipality and used exclusively by it for the activity eligible for the constitutional ad valorem property tax exemption.

D. Delineating "Municipal or Public Purposes" Under Article VII, Section 3(a)
In the absence of any indication in the Constitution to the contrary, we conclude that the term "municipal or public purposes" should be construed in accordance with the definition utilized by the Court in its prior decisions on the constitutional tax exemption. There is nothing in the language of article VII, section 3(a) that evinces an intent to create a more restrictive definition of "municipal or public purposes" for property that is owned and used exclusively by the municipality than the definition applied to "municipal purposes" under the 1885 Constitution in McDavid and Saunders through the 1968 adoption of the current provision. Although McDavid and Saunders rested at least in part on judicial deference to the Legislature's assessment of what type of activity served municipal purposes, we have no basis to conclude that a narrower construction was intended when the self-executing exemption was included in the 1968 Constitution. To the contrary, had the framers of article VII, section 3(a) intended to narrow the exemption, they could have specifically defined *264 "municipal or public purposes," or used different terms altogether.
This determination is consistent with the principle that the Legislature "is presumed to have adopted prior judicial constructions of a law unless a contrary intention is expressed," Florida Dep't of Children & Families v. F.L., 880 So.2d 602, 609 (Fla.2004), which is equally applicable on the constitutional level. See generally Coastal Fla. Police Benev. Ass'n v. Williams, 838 So.2d 543, 548 (Fla.2003) (stating that rules governing statutory construction are generally applicable to construction of constitutional provisions). As stated by one observer shortly after the adoption of the 1968 Constitution, cases construing the constitutional municipal purposes exemption and the statutory public purposes exemption "continue to be good law even after the adoption of the new constitution." Robert F. Williams, Note, Property Tax Exemptions Under Article VII, Section 3(a) of the Florida Constitution of 1968, 21 U. Fla. L.Rev. 641, 643 (1969).
We therefore conclude that the "municipal or public purposes" for which municipally owned property must be exclusively used in article VII, section 3(a) to qualify for an ad valorem tax exemption encompass activities that are essential to the health, morals, safety, and general welfare of the people within the municipality. We agree with the dissent on the parameters of this test, but disagree on its application in determining the facial constitutionality of the challenged legislation.

E. Whether the Tax Exemption Under Article VII, Section 3(a) Necessarily Applies to Municipal Telecommunications Facilities
In putting this definition into practice, we focus on the word "essential," which is generally defined as something basic, necessary, or indispensable. See Merriam-Webster's Collegiate Dictionary 396 (10th ed. 1999). For example, an "essential element" is one on which proof is required in order to establish a legal claim or criminal offense. See, e.g., Rubano v. Dep't of Transp., 656 So.2d 1264, 1266 (Fla.1995) ("Proof that the governmental body has effected a taking of the property is an essential element of an inverse condemnation action."); Randall v. State, 760 So.2d 892, 901 (Fla.2000) ("[P]remeditation is the essential element that distinguishes first-degree murder from second-degree murder."). Thus, inherent in the word essential is the concept of great need or necessity.
A thread of necessity also runs through the precedent concerning tax exemptions for municipal use of municipally owned property that we have discussed. In McDavid, which held a tax exemption for a public housing facility valid, the Legislature had declared that housing conditions were "a menace to the health, safety, and morals of the people ... necessitat[ing] excessive expenditures for crime and fire prevention, health, and welfare," and that public safety "demand[ed]" replacement of slums by "sanitary and better housing facilities." 200 So. at 101 (emphasis supplied). In upholding the tax exemption for property owned by a municipal power company located in another county in Saunders, we recognized that the Legislature "was doubtless well aware of the need for light, heat and power by those areas outside of municipalities." 25 So.2d at 650. Similarly, in Ford, this Court held that the production of electricity by a municipality's power company served a municipal purpose. See 629 So.2d at 847. Such services are essential in that municipally owned power companies have legally protected monopolies within their territorial boundaries, and have traditionally provided these *265 services. See § 366.11(1), Fla. Stat. (2004); City of Homestead v. Beard, 600 So.2d 450, 452 (Fla.1992). Finally, the tax-exempt status upheld in Mikos for vacant land held by a municipality to preserve natural open spaces or for future needs, 374 So.2d at 461, is consistent with the traditional municipal function of providing parks for the municipal population. Cf. City of Miami Beach v. Hogan, 63 So.2d 493, 495 (Fla.1953) (stating that "[i]n all heavily populated municipalities the police power should be exercised by municipal officials to afford all of the people light, air, [and] an opportunity for recreation").
Unlike electrical power and public parks, telecommunications services have historically been provided by the private sector. The Legislature's rationale for opening telecommunications services to competition by various entities including municipalities was to "provide customers with freedom of choice, encourage the introduction of new telecommunications service, encourage technological innovation, and encourage investment in telecommunications infrastructure." § 364.01(3), Fla. Stat. (2004). However, under the law applicable to this case, municipalities may enter the market regardless of whether their participation furthers any of these goals. In other words, a municipality, using infrastructure advantages gained from its pre-existing utility operations, may enter a market in which a high level of service and competition already exists without introducing new levels of service, fostering innovation, or encouraging infrastructure investment. If that is the case, the municipal telecommunications company does not provide a service that is essential to the health, morals, safety, and general welfare of the people within the municipality.[13]
Because this is a facial challenge to the constitutionality of legislation taxing municipal use of municipally owned property, we need not determine whether the specific services provided by the City pass this test. As stated above, in a facial constitutional challenge, we determine only whether there is any set of circumstances under which the challenged enactment might be upheld. See Bales, 343 So.2d at 11 ("[A]ny legislative enactment ;carries a strong presumption of constitutionality, including a rebuttable presumption of the existence of necessary factual support in its provisions. If any state of facts, known or to be assumed, justify the law, the court's power of inquiry ends.") (citation omitted); Cashatt, 873 So.2d at 434 ("A facial challenge to a statute is more difficult than an `as applied' challenge, because the challenger must establish that no set of circumstances exists under which the statute would be valid.") We conclude that in a situation in which municipal telecommunications services do not promote any of the goals set forth above from section 364.01, Florida Statutes, for the benefit of the municipal population, property used to provide those services does not serve "municipal or public purposes" and therefore is not exempt *266 from ad valorem taxation under article VII, section 3(a).

III. CONCLUSION
For the reasons we have stated, we hold that section 166.047(3), Florida Statutes (1997), as enacted in chapter 97-197, section 2, Laws of Florida, and the amendment to section 196.012(6) contained in section 3 of the same act are not unconstitutional on their face. We do not determine the constitutionality of these provisions as applied. We reverse the decision of the First District holding the provisions facially unconstitutional, and remand with directions to reverse the summary judgment granted in the City of Gainesville's declaratory judgment action in this case.
It is so ordered.
WELLS, LEWIS, QUINCE, CANTERO, and BELL, JJ., concur.
ANSTEAD, J., dissents with an opinion.
ANSTEAD, J., dissenting.
I respectfully disagree with the majority's determination to strictly and narrowly construe the term "municipal purpose" as it appears in Florida's Constitution, by limiting the definition to only "activities that are essential to the health, morals, safety, and general welfare of the people within the municipality." Majority op. at 264 (emphasis added). The majority's adoption of this definition appears both arbitrary and without support from our case law, and it represents an unprecedented challenge to the broad discretion and authority of local government and home rule traditionally favored in Florida. As is immediately evident from comparing today's majority opinion with the comprehensive review of our case law contained in Chief Judge Wolf's opinion for the First District, today's holding constitutes a dramatic break from this Court's unbroken line of decisions broadly construing the term "municipal purpose." Until today, great deference has been shown to the judgment of local government as to the use of municipal property for the benefit of its citizens. Today that deference has been removed.
Further, I cannot concur in the majority's conclusion that a municipality's providing telecommunications services to its residents is not an essential service and, therefore, does not constitute a "municipal purpose" under the majority's analysis. Even without the dramatic backdrop of enormous communication failures occurring during the recent natural disasters and terrorist attacks in this country, it is simply a modern fact of life that our citizens and our communities view the widespread availability of the latest in communication technology as essential to their general welfare.

Constitutional History and the Broad Interpretation of "Municipal Purpose"
Consistent with this Court's virtually unbroken precedent and case law, the First District below concluded that "municipal purpose" should continue to be given a broad definition. While I will also attempt to briefly review our constitutional and case law history, I would suggest that Chief Judge Wolf's opinion flawlessly and comprehensively speaks for itself in its interpretation of the term "municipal purpose" as previously construed by this Court. There is a particular passage in that opinion that gets right to the heart of the issue:
Appellant has not cited any case which supports the proposition that when property is owned and used by a municipality the term "municipal purpose" as used in Article VII, Section 3(a), Florida Constitution, should be narrowly construed. [Sebring Airport Authority v.] *267 McIntyre, [783 So.2d 238 (Fla.2001)] and other cases cited for adopting a narrow interpretation involve situations where municipal property is being leased or utilized by a private entity. In Williams v. Jones, 326 So.2d 425, 432 (Fla.1975), a case where a municipality leased municipal property, the court stated that one person operating a commercial establishment for profit should not have an advantage over another commercial establishment also operating for purely proprietary purposes just because one is located on governmental property. The same policy considerations do not apply where the property is being owned and operated by the municipality itself, in which case the focus of the municipality is the provision of service to its citizens. See, e.g. City of Boca Raton v. Gidman, 440 So.2d 1277 (Fla.1983). In fact, we are unaware of any public policy reason when property is owned and operated by a municipality that the term "municipal purpose" should not be given its generally accepted meaning in accordance with Article VIII, Section 2(b), Florida Constitution. The Fifth District's opinion in [Greater Orlando Aviation Authority v.] Crotty, 775 So.2d [978,] 978 [(Fla. 5th DCA 2000)], and the opinion of this court in Page v. Fernandina Beach, 714 So.2d 1070 (Fla. 1st DCA 1998), support such a uniform construction. The Crotty court noted,
[T]he constitution exempts from taxation property owned by a municipality and used exclusively by it for municipal or public purposes. The term "municipal purpose" has been defined as encompassing all activities essential to the health, morals, protection and welfare of the municipality. State v. City of Jacksonville, 50 So.2d 532, 535 (Fla.1951). "Municipal functions" are those created or granted for the special benefit and advantage of the urban community embraced within the corporate boundaries. Chardkoff Junk Company v. City of Tampa, 102 Fla. 501, 135 So. 457 (1931). See also State ex rel. Harper v. McDavid, 145 Fla. 605, 200 So. 100 (1941); City of Winter Park [v. Montesi], 448 So.2d [1242,] 1244 [(Fla. 5th DCA 1984)]. Our courts have ruled that municipal functions include functions which specifically and peculiarly promote the comfort, convenience, safety and happiness of the citizens of the municipality rather than the welfare of the general public.

Crotty, 775 So.2d at 980-981 (emphasis in original).
Dep't of Revenue v. City of Gainesville, 859 So.2d 595, 598-99 (Fla. 1st DCA 2003) (footnotes omitted). This passage focuses on the broad authority granted to municipalities to utilize property owned and used by the municipality to serve its citizens in a broad variety of ways, while still enjoying the constitutional tax exemption that was placed in the constitution to encourage that very activity. Obviously, such a tax exemption has served as an incentive to cities to serve their citizens. With today's decision, that incentive and the services that go with it have been placed at risk.
The Constitution of 1885 provided that property owned by corporations "shall be subject to taxation unless ... used exclusively for religious, scientific, municipal, educational, literary or charitable purposes." Art. XVI, § 16, Fla. Const. of 1885 (emphasis added). Under this Court's case law, the term "municipal purpose" has been consistently interpreted broadly to permit cities wide latitude in using municipal property to serve municipal residents, while still enjoying a constitutional tax exemption. For example, in State v. City of Tallahassee, 142 Fla. 476, *268 195 So. 402 (1940), this Court held that a city's construction of an office building for rent was such a "municipal purpose" contemplated by the constitutional tax exemption. Id. at 403. In fact, in the same opinion this Court noted that the construction of "[a]irports, golf courses, school buildings, and other structures" would be proper "municipal purposes." Id.
Subsequently, again construing this provision broadly, this Court held that holding a proprietary interest in "a community recreational asset and business stimulant," like a speedway, served a "municipal purpose" because it contributed to the economic well-being of the community, thereby rendering even the lessees' interest in the property exempt from ad valorem taxation under the 1885 constitutional language. Daytona Beach Racing & Recreational Facilities Dist. v. Paul, 179 So.2d 349, 354 (Fla.1965); see also State v. Daytona Beach Racing & Recreational Facilities Dist., 89 So.2d 34, 37 (Fla.1956) (noting that this Court has "on numerous cases approved as a public purpose the development of recreational facilities"). In fact, it was this case and others like it, extending the benefit of the constitutional tax break to private entities, that eventually led to a revision of these tax provisions.
Subsequently, article VII, section 3(a) of the 1968 Constitution was revised to prevent private entities from continuing to enjoy a constitutional tax exemption when municipalities leased property to them. The majority appears to acknowledge the purpose of the 1968 revisions to address these seemingly unfair tax breaks for private entities. See Majority op. at 260-61 ("Thus, although the framers of article VII, section 3(a) sought to limit the holding in Daytona Beach Racing, they did so by requiring both ownership and exclusive use of the property by the municipality rather than by narrowing the definition of municipal purpose.") (emphasis added). Of course, the majority's acknowledgment is based on our own case law. See Volusia County v. Daytona Beach Racing & Recreational Facilities Dist., 341 So.2d 498, 501 (Fla.1976) ("Perceiving decisions [such as Daytona Beach Racing] as creating inequities in the tax structure, the draftsmen of the Constitution of 1968 limited the municipal purpose exemption to `property owned by a municipality and used exclusively by it for municipal or public purposes.'"); Bonnie Roberts, Ad Valorem Taxation of Leasehold Interests in Governmentally Owned Property, 6 Fla. St. U.L.Rev. 1085, 1091-92 (1978) (stating that Daytona Beach Racing "dealt a substantial blow to the legislature's attempt to tax leasehold interests," and that the drafters of the 1968 Constitution "attempted to deal with the problem by limiting the constitutional grounds on which an exemption could be based"). No one has ever suggested that the 1968 amendment was intended to take away the exemption from municipalities that both owned the land and used it for the benefit of local residents.
Hence, the focus of the 1968 revision was on the leasing of municipal property to private parties, rather than on the use of municipal property by the municipality itself, the issue before us today. Clearly, the broad exemption of municipal property owned by municipalities and used by them for public purposes, and not leased to private entities, remained in place in our constitution after 1968.[14] Thus, given both *269 the substantial case law interpreting this phrase as broadly inclusive, and the narrow focus of the amendments of the Constitution in 1968 concerning private entities enjoying tax breaks, it seems evident that the term "municipal purpose" should continue to be broadly construed when it is applied to municipal property owned and used by a municipality to serve its citizens.
Indeed, that is precisely what this Court did in 1979 in rejecting a claim that property owned by a municipality to meet future undesignated needs was not entitled to a constitutional tax exemption. In City of Sarasota v. Mikos, 374 So.2d 458 (Fla. 1979), Justice Overton declared for a unanimous Court:
A reading of section 3(a) of article VII clearly establishes that it is a self-executing provision and therefore does not require statutory implementation. The change in the language of chapter 196 is irrelevant because although a statute may grant additional exemptions, it may not repeal the exemptions granted municipalities by the constitution. In our view, the city's holding of vacant land to meet the future needs of the public and to preserve natural open spaces is not a private use. We do not believe municipalities are required to dedicate land for a particular purpose, construct buildings, or otherwise be active on their land in order to maintain the tax exempt status of the property. Neither the constitution nor common sense requires there be an active use of such property. We hold that vacant land held by a municipality is presumed to be in use for a public purpose if it is not actually in use for a private purpose on tax assessment day....
We recognize that property owned by a municipality is not exempt from taxation if it is used for a private purpose. See Panama City v. Pledger, 140 Fla. 629, 192 So. 470 (1939) (land leased to a private corporation is not in use for a public purpose); City of Bartow v. Roden, 286 So.2d 228 (Fla. 2d DCA 1973) (land leased to a private enterprise for nonaeronautical activities is not in use for public purpose); Illinois Grain Corp. v. Schleman, 144 So.2d 329 (Fla. 2d DCA 1962) (land leased to a private corporation is not in use for a public purpose). None of these cases even imply that unimproved vacant land owned by a municipality falls within the category of land held for a private purpose.
If the contentions of the property appraiser were adopted, the tax burden of county residents would be reduced at the expense of city taxpayers. This result *270 is contrary to the purpose of our present constitution which provides that each local governmental entity shall have the same basic taxing authority, shall pay its own way, and shall not receive benefits at the expense of another local governmental unit.
Id. at 460-61. In essence, our Mikos opinion approved of a rebuttable presumption in favor of an article VII tax exemption for municipally owned property not being used for a private purpose, even when the property was not in current use. Today's majority, and its new and explicit requirement of "basic, necessary, or indispensable," simply cannot be reconciled with our holding in Mikos giving deference to a municipality's legislative judgment as to what constitutes a municipal or public purpose unless the property is "actually in use for a private purpose." Id. at 461.

Majority's Definition of "Municipal Purpose"
It would also appear that the majority opinion is engaging in a flawed analysis by using the terms "basic, necessary, or indispensable" to now radically limit the scope of "municipal purpose." The majority's reliance on State ex rel. Harper v. McDavid, 145 Fla. 605, 200 So. 100 (1941), to support this definition is especially troubling. In McDavid, this Court did conclude that "a municipal purpose may now comprehend all activities essential to the health, morals, protection, and welfare of the municipality." Id. at 102. But we used the phrase to encompass a broad meaning of municipal purpose. The majority's attempt to use McDavid as precedent for limiting the scope of "municipal purpose" is simply inconsistent with the actual broad construction and analysis we utilized in that case. In McDavid, for example, we cited to City of Tallahassee and mentioned golf courses, among other items, as endeavors that fall under the "very much expanded" definition of "municipal purpose." McDavid, 200 So. at 102. Moreover, we stated, "The time was when a municipal purpose was restricted to police protection or such enterprises as were strictly governmental but that concept has been very much expanded...." Id. Of course, McDavid recognized and endorsed this broad expansion. In other words, it is virtually impossible to use our opinion in McDavid as the basis for narrowly construing the term "municipal purpose" when the opinion explicitly utilizes and approves a broad definition of the term.

Authority of Local Governments
It is also virtually impossible to square the majority's narrow construction of the term "municipal purpose" with Florida's long history favoring home rule and local government and decision-making at the local level as to the use of municipal property to serve local residents. The approach advocated by the majority alters the historic presumption in favor of cities that has traditionally allowed them broad discretion to decide what constitutes a "municipal purpose." By now restricting the definition of "municipal purpose" to include only those endeavors deemed "essential," the majority seems to suggest that municipalities cannot be trusted to determine what activities benefit its own citizens.
In fact, with the majority's new and restrictive definition of "municipal purpose," one is left to wonder what will happen to all of the services that municipalities now provide, including municipal parks, pools, zoos and a multitude of other services that have previously withstood court challenges to their tax-exempt status.[15] Hopefully, the majority is not signaling *271 a return to the days of the early twentieth century "when a municipal purpose was restricted to police protection or such enterprises as were strictly governmental." See McDavid, 200 So. at 102. Surely, the technological and societal advances recognized as appropriate for municipal attention since the early twentieth century are too significant for this Court to now roll back the clock on the services that Florida's municipalities have decided to provide their citizens through the use of municipally owned property.

Providing Telecommunications as a Municipal Purpose
Finally, even adhering to the majority's new definition of "municipal purpose" as one "essential to the health, morals, protection, and general welfare of the municipality," surely it cannot be denied that providing telecommunications services meets this description. In the midst of a technological and communications revolution that has been hailed as having a greater impact on civilization than anything that has preceded it, we cannot deny local governments the opportunity to bring these benefits to their citizens. I have already alluded to the fact that we are deciding this case in a backdrop of natural disasters where government at all levels, including local, has been sharply criticized for its communications failures.[16]
The First District's opinion clearly articulates why the provision of telecommunications services should be considered a municipal purpose:
[I]f municipality-owned property is being used by the municipality for a public purpose, the legislature may not remove the exemption. Yet, that is precisely the purpose of section 166.047. The legislative staff analysis of chapter 97-197 states the purpose of the act: to "remove the exemption that municipalities, counties, or other entities of local government have for ad valorem taxes on real property used for the purpose of providing telecommunication services to the public." Fla. H.R. Comm. on Utils. and Communications, HB 313 (March 5, 1997) Staff Analysis (on file with Comm.). The only issue before us is whether this property which is owned by the City is being used for a municipal purpose.
. . . .
Indeed, the provision of telecommunication services for the benefit of city residents constitutes a valid municipal purpose pursuant to any reasonable interpretation *272 of the term "municipal purpose." The best evidence in this regard is the statute itself which recognizes that political subdivisions within the state may be issued certificates by the Public Service Commission to act as a telecommunications provider. See § 364.02(13), Fla. Stat.
In addition, as recognized by the trial court, there is a long history in Florida and elsewhere in this country of local governments providing utility services. In discussing the provision of telecommunications services, the trial court stated,
While the provision of telecommunications services may also partake of "no aspect of sovereignty," it is no less "a legitimate municipal corporate undertaking for the comfort, convenience, safety, and happiness of the municipality's citizens" than a marina. Indeed, if anything, it is more analogous to such services as electricity and water, long recognized as serving valid municipal and public purposes. See Ford v. Orlando Utilities Comm'n, 629 So.2d 845 (Fla.1994) (property used in furnishing electricity is used for valid municipal purpose and exempt from tax under the Florida Constitution); Schultz v. Crystal River Three Participants, 686 So.2d 1391 (Fla. 5th DCA 1997) (interest of municipalities in private power plant was tax exempt); Orlando Utilities Comm'n v. Milligan, 229 So.2d 262 (Fla. 4th DCA 1969) (furnishing of electricity, power, and water was municipal purpose under Florida's 1885 Constitution.)
(footnote omitted).
Indeed, the provisions of telecommunication services are still regulated by the Public Service Commission just like water, sewer, and electricity. See Chs. 362, 366, and 367, Fla. Stat. Telecommunication providers like utilities provide essential public services.
Telegraph and telephone companies as ordinarily operated are categorized as "public service corporations," and in legal phraseology as "quasi-public corporations" or "corporations affected with a public interest." They are important agencies and instrumentalities of commerce, in constant use in conducting both governmental and private affairs of the country, so that the public clearly has an interest in such business. The property employed, as well as the proceeds of the business, belongs to the company, but such property is used and the business conducted for the accommodation and convenience of the public.
74 Am.Jur.2d Telecommunications § (2003) (footnotes omitted).
City of Gainesville, 859 So.2d at 598, 600-01 (footnotes omitted). The First District opinion demonstrates just how well and naturally the provision of communications services fits in a natural evolution of "municipal purpose."
Certainly no one could argue the relevance of telecommunications services in today's day and age, the information age. In modern society, for example, telecommunications services have become essential to meet the educational needs of our children and all of our citizens. Without telecommunications, there would be no radio, television, or internet broadcasts warning of impending hurricanes or other emergencies; there would be no telephone service with which to call the police, fire department, or hospitals. Therefore, it would seem apparent that telecommunications services especially qualify as a municipal purpose, even under the majority's newly created definition.[17]
*273 It would appear to be undeniable that allowing municipalities to enter the telecommunications market would greatly benefit all of the citizens of Florida, especially in rural areas where there may be few, if any, telecommunications service providers at present. Just as rural electrification was once seen as an enormous boost to the quality of life of rural residents, modern communications technology has been hailed as an unsurpassed opportunity to advance all mankind.

Conclusion
Today's decision deals a substantial blow to local government in Florida, placing in doubt the constitutional tax-exempt status of all municipal property whose public use does not fit the majority's new and restrictive definition of municipal purpose.
When Florida's constitution was revised in 1968, it was logically changed in response to what was perceived to be an abuse of the use of tax exemptions for private lessees enjoying the benefits to which only municipalities were entitled. However, the use of municipally owned property to benefit municipal residents was not an issue, and the term "municipal purpose" was not altered. The sole purpose of the 1968 change was to prevent a private entity from gaining a tax exemption by leasing property from a municipality. There was no intent to change the meaning of "municipal purpose," and that meaning should continue to have the same broad definition that this Court has given it for over seventy years. The First District's decision and Florida's constitutional commitment to strong local government should be affirmed. I dissent.
NOTES
[1] The validity of the statutory requirement that counties and local governmental entities other than municipalities pay ad valorem taxes on property used in providing telecommunications services is not before us in this case.
[2] Article VIII, section 2(b), Florida Constitution, provides that "[m]unicipalities shall have governmental, corporate and proprietary powers to enable them to conduct municipal government, perform municipal functions and render municipal services, and may exercise any power for municipal purposes except as otherwise provided by law." Thus, both article VII, section 3(a) and article VIII, section 2(b) use the term "municipal purpose."
[3] Section 196.199(1)(c), Florida Statutes (2004), which has remained unchanged since 1995, provides:

All property of the several political subdivisions and municipalities of this state or of entities created by general or special law and composed entirely of governmental agencies, or property conveyed to a nonprofit corporation which would revert to the governmental agency, which is used for governmental, municipal, or public purposes shall be exempt from ad valorem taxation, except as otherwise provided by law.
[4] The City has also signed thirty leases with seven wireless telecommunications providers to locate antennas on thirteen towers owned or operated by the City. Its complaint challenging taxation on these facilities was dismissed on procedural grounds. See Crapo v. City of Gainesville, 855 So.2d 203 (Fla. 1st DCA 2003), review denied, 895 So.2d 404 (Fla.2005).
[5] See art. VII, § 4(a)-(e), Fla. Const.
[6] The statutory tax exemption in section 196.012(6) is as follows:

Governmental, municipal, or public purpose or function shall be deemed to be served or performed when the lessee under any leasehold interest created in property of the United States, the state or any of its political subdivisions, or any municipality, agency, special district, authority, or other public body corporate of the state is demonstrated to perform a function or serve a governmental purpose which could properly be performed or served by an appropriate governmental unit or which is demonstrated to perform a function or serve a purpose which would otherwise be a valid subject for the allocation of public funds.
[7] The Legislature has long had the authority to grant cities the status of municipal corporations. See Coen v. Lee, 116 Fla. 215, 156 So. 747, 749 (1933) ("The creation of municipal corporations with governmental powers and the establishment and regulation of municipalities are inherent legislative powers ...."); § 165.041(1)(a), Fla. Stat. (2004) ("A charter for incorporation of a municipality ... shall be adopted only upon a special act of the Legislature....").
[8] The Court grounded this aspect of its holding in article VIII, section 8 of the 1885 Constitution, which gave the Legislature power to prescribe the jurisdiction and powers of municipalities.
[9] See Walden v. Hillsborough County Aviation Auth., 375 So.2d 283, 287 (Fla.1979).
[10] See Williams v. Jones, 326 So.2d 425 (Fla.1975).
[11] The Court noted that although article VII, section 3(a) permits taxation of municipally owned property located outside the municipality if authorized by general law, the Legislature had not authorized such taxation. See id. at 847; accord Schultz v. Crystal River Three Participants, 686 So.2d 1391, 1392-93 (Fla. 5th DCA 1997) (in absence of general law requiring payments to tax unit in which plant was located, cities' interest in nuclear power plant was tax exempt under article VII, section 3(a) and section 196.199(2)(c), Florida Statutes).
[12] The dissent asserts that our decision in this case cannot be reconciled with Mikos. We disagree. The presumption underlying Mikos, that vacant land owned by a municipality is held for a public purpose, would be inappropriate for municipally owned property used by the municipality to engage in a business venture to provide services in competition with the private sector.
[13] The 2005 Legislature enacted, and the Governor signed, legislation placing restrictions on municipalities operating telecommunications businesses. See Ch.2005-132, § 8, Laws of Fla. The new law requires municipalities that plan to start a telecommunications business to conduct hearings on whether the services it proposes to provide are already generally available in the community. The law also places financing, pricing and accounting restrictions on municipalities providing telecommunications services, and provides that if a municipality cannot show a profit from its telecommunications business within four years, it must cease operations, enter into a partnership with private business, or put the question of whether to continue to provide service to a vote of its governing body. Municipalities that, as of April 1, 2005, had a certificate to sell telecommunications services are exempted from some of the new requirements.
[14] The First District's opinion directly addresses the issue of whether the broad tax exemption for municipal property remained in place after the 1968 constitutional revision:

In Page v. Fernandina Beach, we specifically noted that city owned and operated (as opposed to leased out) property was exempt from taxation under a broad construction of "municipal purpose:"
Municipal operation of a marina is a legitimate municipal corporate undertaking for the comfort, convenience, safety, and happiness of the municipality's citizens. Indeed, the uncontradicted expert testimony was that operation of this marina constituted a proper municipal or public function. When a city operates a marina it owns, marina property it has not leased to a nongovernmental entity is exempt from ad valorem taxation.... But operating a marina partakes of no aspect of sovereignty and does not warrant an exemption for a marina leased to a nongovernmental operator seeking profits.
Page, 714 So.2d at 1076-1077.
City of Gainesville, 859 So.2d at 599-600. Page was recently approved by the Third District in Islamorada, Village of Islands v. Higgs, 882 So.2d 1009 (Fla. 3d DCA 2003). In that case, the Village of Islamorada, a municipality, owned and operated a marina available for use by the general public. Id. at 1010. Emphasizing that the marina was operated without the involvement of a non-governmental lessee or operator, the Third District relied on Page's definition of a public purpose as one that promotes the "comfort, convenience, safety and happiness of [its] citizens" in upholding a tax exemption for the marina. Id. at 1011 (quoting Page, 714 So.2d at 1076).
[15] Ironically, while seemingly narrowing the definition of municipal purpose, the majority indicates its agreement that the exemption should broadly apply to property owned and stockpiled by a municipality for undesignated "future uses" as this Court held in Mikos.
[16] Indeed, if the contents of a recent Associated Press news story is accurate, the City of Gainesville is not the only city being challenged for its attempts to provide its citizens better communications services:

To help boost its stalled economy, hurricane-ravaged New Orleans is offering the nation's first free wireless Internet network owned and run by a major city.
Mayor Ray Nagin said Tuesday the system would benefit residents and small businesses who still can't get their Internet service restored over the city's washed out telephone network, while showing the nation "that we are building New Orleans back."
The system started operation Tuesday in the central business district and French Quarter. It's to be available throughout the city in about a year.
Hundreds of similar projects in other cities have met with stiff opposition from phone and cable TV companies, which have poured money into legislative bills aimed at blocking competition from government agencies  including a state law in Louisiana that needed to be sidestepped for the New Orleans project.
New Orleans to Offer Free Wireless Internet Citywide, Gainesville Sun, Nov. 30, 2005, at 9B.
[17] The majority notes that telecommunications services have historically been provided by the private sector and that, furthermore, since municipalities are not required to further one of the goals stated in section 364.01(3), Florida Statutes (2004), this serves as additional evidence that their participation in the market does not serve a "municipal purpose." Majority op. at 265. However, while there may be concerns that municipalities should not have an unfair advantage when competing with private companies already providing telecommunications services in an area, in reality, that concern is always present. There is essentially no limit to the services private businesses can provide in areas of service traditionally provided only by governments, including the operation of private prisons. Further, as pointed out in the majority's opinion, the City has stated the obvious, that the profits generated from a telecommunications business, as with all other municipal revenue, would be reinvested in the community and thereby serve all of the community's residents both directly and indirectly. Majority op. at 255. This concern of municipalities having an unfair advantage over private companies is also alleviated with the recent regulatory legislation that requires municipalities to jump through many hoops when entering the telecommunication services business. See Majority op. at 265 n. 13. The governor signed the bill into law on June 2, 2005. Ch. 2005-132, § 8, Laws of Fla.