953 So.2d 557 (2007)
CITY OF GAINESVILLE, (the "City"), Appellant/Cross-Appellee,
v.
Ed CRAPO, as Property Appraiser for Alachua County, Florida, Von Fraser; as Tax Collector for Alachua County, Florida; Jim Zingale, as Director of the Florida Department of Revenue, Appellees/Cross-Appellant.
No. 1D05-4253.
District Court of Appeal of Florida, First District.
February 12, 2007.
Rehearing Denied April 12, 2007.
*558 Elizabeth A. Waratuke, Litigation Attorney, and Marion J. Radson, City Attorney, Gainesville, for Appellant/Cross-Appellee.
Steven L. Brannock of Holland & Knight, LLP, Tampa, Amicus Brief of the Florida League of Cities, Inc. and the Cities of Lakeland, Orlando, St. Petersburg, and West Palm Beach.
Bill McCollum, Attorney General, and Nicholas Bykowsky, Assistant Attorney General, Tallahassee, for Appellee/Cross-Appellant the Florida Department of Revenue; Sherri L. Johnson and John C. Dent, Jr. of Dent & Johnson, Chartered, Sarasota, for Appellee/Cross-Appellant Ed Crapo.
Donna E. Blanton and Susan F. Clark of Radey, Thomas, Yon & Clark, P.A., Tallahassee, Amicus Curiae Brief of the Florida Telecommunications Industry Association Supporting the Appellees/Cross-Appellant(s).
LEWIS, J.
Appellant/Cross-Appellee, the City of Gainesville ("City"), appeals the trial court's order granting final summary judgment partially in favor of appellees/cross-appellants, Ed Crapo, as Property Appraiser for Alachua County, Florida, Von Fraser, as Tax Collector for Alachua County, Florida, and Jim Zingale, as Director of the Florida Department of Revenue *559 ("Department"), arguing that the trial court erred in finding that nine of its communication towers and its "Deerhaven Property" were subject to ad valorem taxation. On cross-appeal, Crapo and the Department argue that the trial court erred in granting final summary judgment in favor of the City with regard to its fiber optic network and internet equipment because that property is not exempt from ad valorem taxation pursuant to article VII, section 3(a) of the Florida Constitution. For the reasons expressed herein, we affirm the trial court's ruling as to the communication towers and Deerhaven Property but reverse its conclusion as to the fiber optic network and internet equipment and remand for further proceedings consistent with this opinion.
On December 8, 2003, and December 6, 2004, the City filed suit against appellees/cross-appellants, seeking a declaratory judgment that certain property was exempt from ad valorem taxation. Specifically, the City asserted that in 2003 and 2004, ad valorem taxes were erroneously imposed on nine of its communication towers, its fiber optic network and internet service provision equipment, and its "Deerhaven Property." The City contended that all of the property at issue was exempt pursuant to article VII, section 3(a) Florida Constitution and section 196.199, Florida Statutes, because it was used for a municipal or public purpose. The cases were eventually consolidated for purposes of summary judgment. On May 11, 2005, the City filed a Motion for Summary Judgment, arguing that it was entitled to judgment as a matter of law because there was no genuine issue of material fact "that the City's property is used by it for a municipal or public purpose and thus is exempt from ad valorem taxation." In support of the motion, the City filed affidavits of David Richardson, Edward J. Regan, Jr., Ann Mullins, and Ed Hoffman.
The affidavits of David Richardson, the System Planning Director for the City's utility system, which does business as Gainesville Regional Utilities ("GRU"); Edward J. Regan, the Assistant General Manager for Strategic Planning for GRU; and, Ann Mullins, a land rights coordinator who represented the City in the purchase of the Deerhaven Property, indicate that the City purchased the property to serve as a buffer between its Deerhaven Generating Plant and residential development in the surrounding area and to accommodate future retrofitting or expansion of the plant. Mullins' affidavit further indicates that the City's staff decided that it did not need to purchase a timber operation that existed on the property because the timber did not interfere with the use of the land as a buffer or with the City's plans for future expansion of the plant. Thus, the City purchased the Deerhaven Property in fee simple but did not purchase the timber or timber rights on it, although it retained the first right to do so in the deed and can do so when the timber and timber operation become inconsistent with its use. Although the City was aware the timber company leased hunting rights on the property to a local hunt club, it did not ask the timber company to break the lease because it also did not interfere with the City's use of the property as a buffer.
The affidavit of Ed Hoffman, the acting director of the City's communication utility, which operates under the name "GRUCom," indicates because the City's communication towers can hold more antennas than those required "for City purposes" and to foster the availability of personal communication services, the City entered into lease agreements with several private Personal Communication Service ("PCS") providers that allow them to place antennas *560 on the towers. The affidavit describes the uses of each of the towers as follows: (1) the "Depot Tower" holds one public use antenna that is used by the City's Regional Transit System, is of strategic importance for future public safety uses because of its location, and holds antennas of one PCS provider; (2) the "Sugarfoot Tower" holds two public use antennas that are used by the City's fire and police departments and antennas of two PCS providers; (3) the "Ft. Clarke Tower" supports one public use antenna, which is not currently used by the City but will be reactivated in the future, and antennas of two PCS providers; (4) the "Parker Road Tower" holds one public use antenna that is used by the City's fire rescue department and antennas of one PCS provider; (5) the "Millhopper Tower" is the prime switching site for the City's Trunked Radio System ("TRS"), the primary radio communication system for various public safety and government agencies, and holds the Electric System Control Center, which performs energy management activities, five TRS antennas, five other public use antennas, and antennas of six PCS providers; (6) the "Springhill Tower" supports five public use antennas, three of which are used by the City's fire department and two of which are used by its police department, and antennas of seven PCS providers; (7) the "39th Avenue Tower" does not currently support any public use antennas, although it is planned that a repeater antenna will be installed on it as a backup for the TRS and for other miscellaneous functions, is located in a strategic area near the airport, which makes it an important asset for future expansion of communications capacity, and holds antennas of three PCS providers; (8) the "UF Foundation Tower" supports two public use antennas used by GRU and antennas of five PCS providers and contains space reserved for use by the University of Florida; and (9) the "McMichen Tower" does not support any public use antennas as the public antenna located on the original tower was damaged and removed after the original tower was replaced in 2001 with a tower capable of more antenna loading, is located close to the airport and the City's primary water plant and well fields, and holds antennas of one PCS provider. There are also future plans to install an antenna "to provide improved [TRS] communications capabilities for public safety aviation units" on the McMichen Tower. Hoffman's affidavit further indicates that the City's fiber optic network and internet service provisioning equipment were used both to provide critical municipal services to the City and other government agencies and to provide telecommunication services to the public at a cost.
Crapo subsequently filed a Motion for Final Summary Judgment, asserting that he was entitled to judgment as a matter of law because there was no genuine issue of material fact that the property at issue was not being used exclusively by the City for a municipal or public purpose on January 1 of 2003 or 2004. The Department also filed a Motion for Summary Judgment, arguing that the City's commercial and proprietary use of the property conclusively established that it did not qualify for the article VII, section 3(a) exemption because it was not exclusively used for a municipal or public "governmental-governmental" purpose.
Along with its motion, the Department filed the transcript of the deposition of Ed Hoffman, wherein he testified that the antennas of the private PCS providers took up more of the usable space on the communication towers than the City's antennas and that some of the towers had been rebuilt to hold the antennas of PCS providers. Hoffman acknowledged that if they only needed to hold the City's antennas, *561 the towers would not need to be as structurally sound as they had to be to hold the PCS antennas.
Following a hearing on the motions for summary judgment, the trial court issued the Order on Motions for Final Summary Judgment and Final Judgment that is at issue on appeal. The court granted in part and denied in part each of these motions for summary judgment. With regard to the fiber optic network and internet equipment, the court found "that in today's highly technological society, the communications services provided by the City, just as with electricity and water, constitute a basic and essential utility service," noting the provision of utility services by a municipality has long been held to serve a public purpose and Florida courts have consistently found the property of a municipal electric utility exempt from ad valorem taxation. Because it found "no real difference" between the provision of electricity and water and the provision of telecommunications services, the trial court found that the City was using the fiber optic network and internet equipment exclusively for a public purpose as defined in article VII, section 3(a) of the Florida Constitution. The order sets forth that the trial court believed that such ruling was consistent with this Court's opinion in Department of Revenue v. City of Gainesville, 859 So.2d 595 (Fla. 1st DCA 2003) ("Gainesville I").
With regard to the communication towers, the trial court found that the "governmental-governmental/governmental-proprietary test" set forth in Sebring Airport Authority v. McIntyre, 783 So.2d 238 (Fla. 2001), was applicable and that the undisputed facts established that the use of the towers by the City was not solely governmental-governmental but, rather, governmental-proprietary. Thus, the court concluded that the City was not using the towers exclusively for a municipal or public purpose as defined in article VII, section 3(a), making them subject to ad valorem taxation. The trial court applied the same test to the Deerhaven Property and found the City was not using it exclusively for a municipal or public purpose as defined in article VII, section 3(a) because the use of it was also governmental-proprietary. Therefore, it concluded that the Deerhaven Property was also subject to ad valorem taxation.
In accordance with its findings, the trial court entered a Final Declaratory Judgment in favor of the City with regard to the fiber optic network and internet equipment and in favor of appellees/cross-appellants with regard to the towers and Deerhaven Property. This appeal and cross-appeal followed.
"`Summary judgment is proper if there is no genuine issue of material fact and if the moving party is entitled to judgment as a matter of law.'" Selim v. Pan Am. Airways Corp., 889 So.2d 149, 153 (Fla. 4th DCA 2004) (quoting Volusia County v. Aberdeen at Ormond Beach, L.P., 760 So.2d 126, 130 (Fla.2000)). A trial court's ruling on a motion for summary judgment that poses a purely legal question is subject to de novo review on appeal. Major League Baseball v. Morsani, 790 So.2d 1071, 1074 (Fla.2001).
Article VII, section 3(a) of the Florida Constitution provides, in pertinent part, "All property owned by a municipality and used exclusively by it for municipal or public purposes shall be exempt from taxation." Because this constitutional provision is self-executing, it does not require legislative authorization to activate the exemption for property owned and used exclusively by the municipality for municipal or public purposes. Fla. Dep't of Revenue v. City of Gainesville, 918 So.2d 250, 259 (Fla.2005) ("Gainesville II"). Stated differently, *562 the exemption is not contingent on the Legislature declaring that an activity serves a municipal purpose and is, therefore, tax exempt. Id. However, "[a] tax exemption for portions of property used `predominantly' for municipal purposes, regardless of ownership, still requires legislative authorization under the express terms of article VII, section 3(a)." Id. at 260.
The issue on cross-appeal, which we address first, is whether the trial court erred in finding that the City's fiber optic network and internet equipment were tax exempt pursuant to article VII, section 3(a). In reaching that conclusion, the trial court relied on our opinion in Gainesville I. There, we affirmed the trial court's determination that section 2 of chapter 97-197, Laws of Florida, which created section 166.047, Florida Statutes,[1] and a portion of section 3 of chapter 97-197, which amended section 196.012, Florida Statutes, to provide that a municipality's provision of two-way telecommunications services to the public is not an exempt use for ad valorem tax purposes unless the services comply with certain conditions, were facially unconstitutional because they contravened article VII, section 3(a). Gainesville I, 859 So.2d at 596-97. We reasoned that the City was using the property at issue for a municipal purpose and that the Legislature's attempt to condition the provision of municipal services on the payment of an amount equal to ad valorem tax liability directly conflicted with article VII, section 3(a). Id. at 597. In rejecting the Department's argument that municipal purpose should be narrowly defined where property is owned and operated by a municipality, we noted that we were unaware of any public policy reason why municipal purpose should not be given its generally accepted meaning in accordance with article VIII, section 2(b) of the Florida Constitution under such circumstances.[2]Id. at 598-99. We concluded that "the provision of telecommunication services for the benefit of city residents constitutes a valid municipal purpose pursuant to any reasonable interpretation of the term `municipal purpose,'" noting that the provision of such services was regulated by the Public Service Commission just like water, sewer, and electricity, that "[t]elecommunication providers like utilities provide essential public services," and that in analyzing whether the provision of services serves a municipal purpose under article VII, section 3(a), "the focus is whether the function promotes comfort, convenience, safety, and happiness" of the municipality's citizens. Id. at 601.
However, in Gainesville II, which was issued after the trial court entered its Order *563 on Motions for Final Summary Judgment and Final Judgment in this case, the supreme court reversed Gainesville I, finding that a municipality's provision of telecommunications services does not as a matter of law always serve municipal or public purposes and, thus, that ad valorem taxation of a municipality's telecommunications facilities is not facially unconstitutional. 918 So.2d at 253. In doing so, the supreme court did not dispute that telecommunications services are essential but determined that in providing such services, regardless of circumstances like the availability of the same services through other providers, a municipality does not as a matter of law engage in an activity that is essential to the welfare of the community. Id. The court made clear that the definition of municipal purposes in article VIII, section 2(b) is distinct from and broader than the definition of municipal or public purposes in article VII, section 3(a). Id. at 262-63. Therefore, an activity may serve valid municipal purposes under article VIII, section 2(b) and constitute a permissible municipal function but still not serve a municipal or public purpose under article VII, section 3(a). Id. at 263. The supreme court set forth that the municipal or public purposes for which municipally owned property must be exclusively used to qualify for the exemption in article VII, section 3(a) "encompass activities that are essential to the health, morals, safety, and general welfare of the people within the municipality." Id. at 264. It noted that while the provision of electricity is essential in that municipally owned power companies have legally protected monopolies within their territorial boundaries and have traditionally provided such services, telecommunications services have historically been provided by the private sector. Id. at 264-65. The court further pointed out that although the Legislature's reason for opening telecommunications services to competition by various entities, including municipalities, was to promote the goals set forth in section 364.01(3), Florida Statutes,[3] municipalities can enter a market in which a high level of service and competition already exists without furthering any of those goals. Id. at 265. The court concluded that where municipal telecommunications services do not promote any of those goals for the benefit of the municipal population, property used to provide the services does not serve municipal or public purposes and is not exempt under article VII, section 3(a). Id. at 265-66.
Contrary to Gainesville II, the trial court erroneously concluded that the City's use of the fiber optic network and internet equipment to provide telecommunications services to the public served municipal or public purposes as a matter of law without considering whether the services promoted the goals set forth in section 364.01(3). While the trial court found that the fiber optic network and internet equipment were exempt because the provision of telecommunications services is no different from the provision of utilities like electricity and water, the supreme court made clear in Gainesville II that telecommunications services are distinct in that they have traditionally been provided by the private sector. Accordingly, we reverse the trial court's ruling as to the fiber optic network and internet equipment. However, because the record before us does not contain adequate facts for us to determine *564 whether the City's provision of telecommunications services did, in fact, serve municipal or public purposes pursuant to Gainesville II, we remand the cause to the trial court to make that determination.[4]
In its first issue on appeal, the City argues that the trial court erred in finding its communication towers subject to ad valorem taxation. According to the City, the towers were exempt pursuant to Gainesville II because they were used to provide telecommunication services that promoted the goals of section 364.01(3), Florida Statutes. However, the City did not use the towers to provide services directly to the public but, rather, leased space on the towers to private PCS providers, who then sold telecommunications services to customers for a profit. We do not view this leasing of space on the towers to private companies in the business of providing telecommunications services as the type of provision of telecommunications services that may serve a municipal or public purpose pursuant to Gainesville II. Rather, because the private PCS providers held leasehold interests in the towers, the trial court properly applied the governmental-governmental test for determining whether the article VII, section 3(a) exemption applied. See Gainesville II, 918 So.2d at 260 (stating that for private leaseholds of municipal property, the governmental-governmental test governs eligibility for the ad valorem tax exemption in article VII, section 3(a)). Pursuant to that test, municipal property leased to private entities for governmental-proprietary activities is not exempt. Sebring Airport Auth., 783 So.2d at 248. "A governmental-proprietary function occurs when a nongovernmental lessee utilizes governmental property for-proprietary and for-profit aims." Sebring Airport Auth. v. McIntyre, 642 So.2d 1072, 1074 (Fla.1994).
Here, the private PCS providers used the space they leased on the towers to provide telecommunications services, which have historically been provided by the private sector, see Gainesville II, 918 So.2d at 265, in order to make a profit. Thus, the trial court properly found that the leased portions of the towers were used for governmental-proprietary functions. Although the City also used the towers for governmental communications that undisputedly serve a municipal or public purpose, the fact that private providers leased and used space on the towers in conducting private business contradicts article VII, section 3(a)'s requirement that property be used exclusively by the municipality for municipal or public purposes in order to be eligible for the exemption. See id. at 255 ("To qualify for the exemption in article VII, section 3(a), the property must be both owned by a municipality and used exclusively by the municipality for municipal or public purposes.")
The City also argues that the incidental use of excess space on the towers by private PCS providers did not destroy their tax exempt status. However, its reliance on cases in which private use of property is truly incidental to a primary municipal or public purpose is misplaced. See, e.g., *565 Northcutt v. Orlando Utils. Comm'n, 614 So.2d 612, 618 (Fla. 5th DCA 1993) (finding that because electrical generating and transmission plant was being used exclusively for the municipal purposes of producing and supplying electricity, the incidental sale of sixteen to seventeen percent of the electricity to a private utility company did not detract from the property's use for public purposes); City of Tampa v. Walden, 323 So.2d 58, 61 (Fla. 2d DCA 1975) (holding that the fact that portions of a municipally owned park are leased to private entities and operated for profit does not impair the City's right to an ad valorem tax exemption as long as the leaseholds are accessory to the overall public purpose of the park and serve a function that could otherwise be accomplished with municipal funds). The use of the towers by the private PCS providers was more than incidental to the City's use of the towers for governmental communications. Hoffman's affidavit indicates that each of the nine towers at issue held multiple antennas of at least one private PCS provider, while two of the towers held only two public use antennas, three held only one public use antennas, and two did not hold any antennas being used for public purposes. In his deposition, Hoffman acknowledged that the antennas of the PCS providers took up more of the usable space on the towers than the City's antennas. Furthermore, some of the towers were rebuilt specifically to accommodate the PCS antennas, which required more structurally sound towers than the City's antennas. Because the private PCS providers' leasehold interests in the towers were used for governmental-proprietary functions and the private use of the towers was not incidental to an overall public purpose served by the towers, the trial court properly concluded that the towers were subject to ad valorem taxation.
In its second issue on appeal, the City argues that the trial court erred in finding that its Deerhaven Property was subject to ad valorem taxation because the property was being used for the public purposes of providing a buffer between the generating plant and residential development and accommodating future plant retrofitting and/or expansion. In support of this argument, the City relies on City of Sarasota v. Mikos, 374 So.2d 458 (Fla. 1979). While recognizing that "property owned by a municipality is not exempt from taxation if it is used for a private purpose," the supreme court held that "vacant land held by a municipality is presumed to be in use for a public purpose [under article VII, section 3(a)] if it is not actually in use for a private purpose on tax assessment day." Mikos, 374 So.2d at 460-61 (emphasis added). The supreme court explained that a municipality's holding of vacant land to meet future public needs and to preserve natural open spaces was not a private use and that municipalities are not required to dedicate land for a particular purpose, construct buildings, or otherwise be active on their property in order to maintain its tax exempt status. Id. at 460.
This case is distinguishable from Mikos. There, the vacant property at issue was not actively being used in any manner on tax assessment day; it was simply being held by the municipality either as open space or in reserve to meet future public needs. Id. at 459. Here, although the City purchased one-hundred percent of the fee simple interest in the Deerhaven Property to provide a buffer between the plant and surrounding residential development and for potential future retrofitting and/or expansion of the plant, it is undisputed that a private timber company, which retained the rights to timber on the property, was conducting a for-profit timber operation on January 1 of 2003 and 2004, the *566 relevant tax assessment days. A lease between the timber company and a private hunt club that allowed members of the club to hunt on the Deerhaven Property was also in effect on those days. Because the Deerhaven Property was actually in use for private purposes on both assessment days, the trial court correctly concluded that it was not tax exempt under article VII, section 3(a).
In conclusion, for the reasons expressed above, we AFFIRM the trial court's rulings with regard to the communication towers and Deerhaven Property but REVERSE its ruling as to the fiber optic network and internet equipment and REMAND for further proceedings consistent with this opinion.
THOMAS, J., concurs; BENTON, J., concurs in part and dissents in part with opinion.
BENTON, J., concurring in part and dissenting in part.
I concur in the judgment of the court insofar as it sends the case back for reconsideration of whether the fiber optic network and internet equipment remain exempt in light of the supreme court's decision in Fla. Dep't of Revenue v. City of Gainesville, 918 So.2d 250 (Fla.2005). Even though cross motions for summary judgment were filed below, the parties and the learned trial judge alike were proceeding under the law as they (and we) understood it before the supreme court's decision.
Otherwise, I respectfully dissent from today's decision. With regard to the "communication towers," if the fiber optic network and internet equipment are exempt, the towers should also be exempt, despite the City's leasing space on them to competing cellular telephone companies, "as long as such leaseholds are accessory to the overall public [communications] purpose." City of Tampa v. Walden, 323 So.2d 58, 61 (Fla. 2d DCA 1975). Any part of a tower not leased, moreover, is owned and used by the City (or held by the City for future use).
In addition, the City's locating and building such towers itself, rather than contending with the anticipated proliferation if each company built its own towers, serves a public purpose on aesthetic grounds alone. Leasing to all entities that need space on a tower thus serves a purely municipal purpose, gives nobody a competitive advantage, and, by saving private enterprise the expense of building (redundant) towers itself, is fully consonant with the "Legislature's rationale for opening telecommunications services to competition by various entities including municipalities." City of Gainesville, 918 So.2d at 265.
Finally, with regard to the City's buffer around its electric generating plant, City of Sarasota v. Mikos, 374 So.2d 458 (Fla. 1979), controls. There the supreme court held
that vacant land held by a municipality is presumed to be in use for a public purpose if it is not actually in use for a private purpose on tax assessment day. This holding eliminates the need for a city to designate a use and prove a public purpose for all vacant land each year, as demanded by the property appraiser. In this case, our holding requires a finding that the vacant land set aside by the City of Sarasota for parks and open spaces or held in reserve for future public needs met the use test for public or municipal purposes on January 1, 1977, as required by the constitution.
Id. at 460-61. Although the City of Sarasota owned an unencumbered fee interest, the Mikos rationale applies with equal force to any lesser interest in land a municipality *567 owns and holds in reserve for future public needs.
Here, the City acquired its interest in the 2,276-acre tract from a timber company as a buffer between the plant and development in the area, existing and anticipated, with a view toward retrofitting the plant with pollution control equipment, and against any possible need to expand the plant to serve its residents. The buffer itself protects people from some pollution effects.
5. City staff had discussed internally the ongoing timber operation on the property and that there was no need for the City to purchase the timber operation at this time. The timber was not inconsistent with the use of the land as a buffer, and until the property is actually needed for plant expansion, was not inconsistent with the City's plans for future plant expansion. From the beginning of my discussions and negotiations with the timber company representative, the price negotiations were only for the land itself, not the timber on the land.
6. The City purchased Parcel A in fee simple in November 2001 and Parcel B in fee simple in December 2002, a total of 2,276 acres. The City did not purchase the timber or timber rights on either parcel although it retained the first right to do so in the deed, and can do so when the existence of the timber and timber operation becomes inconsistent with the City use as a buffer or for future expansion of Deerhaven.
7. During the negotiations, the City was aware that the timber company leased hunting rights on the 2,276 acres in Parcels "A" and "B" to a local hunt club as part of overall 14,400 acre hunting lease with the hunt club. Because the hunt lease did not interfere with the City's use as a buffer and aided in maintaining the overall security of the property, the City did not ask the timber company to break the lease.
(Ann Mullins's Aff. ¶¶ 5-7.) The timber company, not the City, still receives annual lease payments from the hunt club. By purchasing an interest in the land that did not include the right to receive these lease payments and did not interfere with the timber company's right to continue timber operations, the City was presumably able to acquire the land and reserve it for future municipal use for significantly less cost to the citizens of Gainesville than if it had purchased the unencumbered fee interest.
Since the City never acquired hunting or timbering rights (or the right to receive lease payments in lieu thereof), the ruling below denied the City a tax exemption not because of any use the City made of its own property, but because of the use the timber company made of property interests the City never acquired. See generally Schultz v. Crystal River Three Participants, 686 So.2d 1391, 1393 (Fla. 5th DCA 1997) (rejecting the "property appraiser['s] argu[ment] that there can be no `partial' tax exemptions for property and that the courts cannot `unbundle' and separate out the respective interests of the owners of property"). Evidence of record suggests that plans for plant improvement and expansion are in the works.
Obtaining the land needed for these purposes on favorable terms served a public or municipal purpose. Even if viewed analytically as creating leaseholdsinstead of as what actually (and for non-tax reasons) occurred historically, producing the arrangements that in fact obtainthe parties' agreements should not render the City's resulting interest taxable, "as long as such [deemed] leaseholds are accessory to the overall public [electric utility] purpose." Walden, 323 So.2d at 61.
NOTES
[1] Section 166.047, Florida Statutes (2002), provides in part:

A telecommunications company that is a municipality or other entity of local government may obtain or hold a certificate required by chapter 364, and the obtaining or holding of said certificate serves a municipal or public purpose under the provision of s. 2(b), Art. VIII of the State Constitution, only if the municipality or other entity of local government:
. . .
(3) Notwithstanding any other provision of law, pays, on its telecommunications facilities used to provide two-way telecommunications services to the public for hire and for which a certificate is required pursuant to chapter 364, ad valorem taxes, or fees in amounts equal thereto, to any taxing jurisdiction in which the municipality or other entity of local government operates. Any entity of local government may pay and impose such ad valorem taxes and fees.
[2] Article VIII, section 2(b) provides in part, "Municipalities shall have governmental, corporate and proprietary powers to enable them to conduct municipal government, perform municipal functions and render municipal services, and may exercise any power for municipal purposes except as otherwise provided by law."
[3] Section 364.01(3), Florida Statutes (2002), provides in part, "The Legislature finds that the competitive provision of telecommunications services, including local exchange telecommunications service, is in the public interest and will provide customers with freedom of choice, encourage the introduction of new telecommunications service, encourage technological innovation, and encourage investment in telecommunications infrastructure."
[4] As Gainesville II was issued after the trial court issued its ruling, the parties understandably did not develop the record to include facts relevant to the issue of whether the City's provision of telecommunications services was essential to the general welfare of its residents and, thus, served municipal or public purposes, such as all of the telecommunications services that the City provides, the private providers that the City competes with, and the telecommunications services that are offered by each of those private providers. While Crapo and the Department repeatedly assert on appeal that the City is merely one of many providers of telecommunications services in a highly competitive market, that assertion is not supported by any record evidence.