NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING
MOTION AND, IF FILED, DETERMINED

IN THE DISTRICT COURT OF APPEAL

OF FLORIDA

SECOND DISTRICT


L. LOWRY BALDWIN and JENNIFER
L. BALDWIN,

        Appellants,

v.

BOB HENRIQUEZ, as Property
Appraiser of Hillsborough County;
DOUG BELDEN, as Tax Collector of
Hillsborough County; and LEON M.
BIEGALSKI, Executive Director of the
Department of Revenue,

        Appellees.

Case No. 2D18-2658

Opinion filed September 13, 2019.

Appeal from the Circuit Court for
Hillsborough County; E. Lamar Battles,
Judge.

Marie A. Borland and Robert E. V. Kelley,
Jr. of Hill, Ward & Henderson, P.A., Tampa,
for Appellants.

William D. Shepherd of Hillsborough
County Property Appraiser's Office, Tampa,
for Appellee Bob Henriquez.

Ashely Moody, Attorney General,
Tallahassee, and Robert P. Elson, Senior
Assistant Attorney General, Tallahassee,
for Appellee Leon Biegalski.

No appearance for Appellee Doug Belden.

BADALAMENTI, Judge.

L. Lowry Baldwin and Jennifer L. Baldwin appeal from a final summary judgment in favor of Bob Henriquez, as Property Appraiser for Hillsborough County, Doug Belden, as Tax Collector, and Leon M. Biegalski, as Executive Director of the Department of Revenue, on all three counts of the Baldwins' amended complaint. In their complaint the Baldwins challenged, among other things, the Property Appraiser's denial of a homestead exemption on their residential property for tax year 2015. We hold that the Baldwins are not entitled to a homestead exemption for their residential property for tax year 2015 because they failed to maintain the subject property as their permanent residence on January 1, 2015.[1]

**Factual Background**

The undisputed facts are as follows: In July 2013, the Baldwins sold their residence and abandoned their homestead. On July 10, 2013, the Baldwins purchased another property with a house on it. They did <u>not</u> move into that house. Instead, in November 2013, the Baldwins demolished the existing house on the property and began construction on a new house on the property.[2] During the construction of the new house, the Baldwins resided at a leased condominium unit and rented a storage unit for their furniture and personal items. They were able to use the dock on the

---

[1]We affirm the remaining issue without comment.

[2]Prior to demolishing the house on the property, Jennifer Baldwin held one book club meeting in that house.

- 2 -

premises of the subject property while their new house was being constructed. When it became obvious that the construction would not be completed by the end of 2014, the Baldwins pitched a tent on the subject property on December 26, 2014, and spent the night on the subject property. Jennifer Baldwin spent one additional night in the tent later that week. As of January 1, 2015, the Baldwins' driver's licenses and voter registration cards reflected the address of the subject property where the new house was being constructed. The new house received a temporary Certificate of Occupancy on June 9, 2015, and the Baldwins moved into their new home on June 11, 2015. Finally, on January 8, 2016, the new house received a final Certificate of Occupancy.

The Baldwins timely applied for homestead exemption and transfer of homestead assessment difference (the Save Our Homes portability benefit) for their new property for tax year 2015. They received a notice of disapproval from the Property Appraiser informing them that their application was denied because the subject property was not the Baldwins' permanent residence as of January 1, 2015. Next, the Baldwins petitioned to the Value Adjustment Board (VAB) seeking a reversal of the Property Appraiser's denial. The VAB agreed with the Property Appraiser and denied their petition. Finally, the Baldwins filed a complaint in the circuit court seeking a declaration that they were entitled to claim homestead exemption for property tax purposes for tax year 2015. They also sought a declaration that they were entitled to a transfer of the Save Our Homes portability benefit.

The parties filed competing motions for summary judgment. The Baldwins argued that their inability to physically occupy the premises as of January 1, 2015, was not determinative of their ability to claim the property as homestead because they

manifested an intent to use the property as their permanent residence. The Property Appraiser, conversely, argued that initial physical occupancy of the homestead property by the taxpayer or a dependent of the taxpayer was required to secure a homestead tax exemption.

The trial court found that initial physical occupancy is not required to establish entitlement to a homestead exemption from ad valorem taxes. Instead, the trial court explained, "it is one factor to consider in conjunction with several others when determining whether an applicant has established a permanent residence at the property for which he seeks the exemption." It further explained that "the determination of permanent residency is not based on the parties' intent alone." The trial court recognized that although the Baldwins undoubtedly intended for the subject property to become their permanent residence at some point in the future, the Baldwins had not yet made the subject property their permanent residence as of January 1, 2015. Ultimately, the trial court found "insufficient indicia of permanent residence at the subject property at the time of assessment to support a homestead exemption." The Baldwins timely appealed.

Because the facts were not in dispute and the issue before the trial court was purely legal, we review the court's entry of summary judgment de novo. Karayiannakis v. Nikolits, 23 So. 3d 844, 845 (Fla. 4th DCA 2009).

**Florida's Homestead Exemption**

The Florida Constitution defines and protects homestead in three different ways.[3]  Chames v. DeMayo, 972 So. 2d 850, 853 (Fla. 2007).  First, the constitution provides homesteads with a tax exemption (article VII, section 6).  Id.  Second, the constitution protects the homestead from forced sale by creditors (article X, section 4(a)).  Id.  Third, the constitution restricts the homestead owner's ability to alienate or devise the homestead property (article X, section 4(c)).  Id.

The constitutional provision providing for a tax exemption for homestead property is found in article VII of the Florida Constitution.  It provides a $25,000 tax exemption for property on which the owner maintains his or her permanent residence.  Art. VII, § 6(a), Fla. Const.  A separate constitutional provision, known as the "Save Our Homes" amendment, provides that the annual change in property tax assessments on homestead exempt property is limited to three percent of the prior year's assessment.  See art. VII, § 4(d)(1)(a), Fla. Const.; Zingale v. Powell, 885 So. 2d 277, 279 (Fla. 2004).  A homeowner may transfer the benefit accrued under the Save Our Homes constitutional amendment (also referred to as the homestead assessment difference) to

_____

[3]Because the homestead provisions found in article VII and article X of the Florida Constitution are separate and distinct, the "principles relating to one do not necessarily govern the other."  Crain v. Putnam, 687 So. 2d 1325, 1326 (Fla. 4th DCA 1997); see also Phillips v. Hirshon, 958 So. 2d 425, 427 n.3 (Fla. 3d DCA 2007) ("It is well appreciated in the case law concerning homestead that the definition of homestead property for Article VII, section 6 purposes is not the same as Article X, section 4 of the Florida Constitution.").  Indeed, while the protections afforded by the homestead exemption in article X are liberally construed, see Taylor v. Maness, 941 So. 2d 559, 562 (Fla. 3d DCA 2006), the homestead exemption in article VII is strictly construed against the taxpayer, see Grisolia v. Pfeffer, 77 So. 3d 732, 736 (Fla. 3d DCA 2011) ("The strict construction applicable to the Tax Exemption stands in contrast to the liberal construction of the homestead exemption from forced sale at issue here."); see also DeQuervain v. Desguin, 927 So. 2d 232, 236 (Fla. 2d DCA 2006) ("[B]ecause the homestead exemption provides relief from an ad valorem tax, we must construe the statute strictly against [the taxpayer].").

a new homestead established within two years of abandonment of the prior homestead. See Nikolits v. Neff, 184 So. 3d 538, 539 (Fla. 4th DCA 2015) (citing art VII., § 4(d)(8), Fla. Const.).

There is no self-executing right to the "Save Our Homes" three percent tax cap. Haddock v. Carmody, 1 So. 3d 1133, 1136 (Fla. 1st DCA 2009) (citing Zingale, 885 So. 2d at 284-85). "Taxpayer eligibility for the Save Our Homes tax limitation is based on entitlement to the homestead exemption under Article VII, section 6." Id. "[A] successful application for a homestead application is necessary both to obtain the exemption and to qualify for the cap." Id. (quoting Zingale, 885 So. 2d at 285). Here, because the Baldwins abandoned their prior homestead in 2013, they had to establish a new homestead within two years—by 2015—to transfer the property tax benefit they accrued under the Save Our Homes amendment. In other words, a determination of the Baldwins' entitlement to a homestead exemption for tax year 2015 also determines their ability to transfer the Save Our Homes portability benefit.

**Discussion**

On appeal, the Baldwins argue that the trial court misapplied the law by focusing too heavily on their lack of physical occupancy of the subject property. They maintain that they are entitled to a homestead exemption for their property even though they were unable to physically occupy the subject property as of January 1, 2015, because they manifested an intent to establish a permanent residence on the subject property and did specific acts in furtherance of this intent. Specifically, they assert that they manifested their intent to establish residence on the subject property by changing their licenses and voter registration cards and abandoning their prior homestead. In

- 6 -

support, they rely heavily on our supreme court's decision in Semple v. Semple, 89 So.

638 (Fla. 1921).  There, our supreme court explained that

> [w]here it is clearly the manifest intention of the owner to
> occupy the premises immediately as a home, and this
> intention is evidenced by specific acts and doings that are
> not compatible with a different intention, and there is nothing
> done by the claimant showing a different intention, or that is
> inconsistent with the asserted intention to make the place his
> homestead, the homestead character will attach.

Id. at 639.  Finally, they emphasize Florida's public policy in favor of preserving the

homestead and assert that denying them a homestead exemption under these facts

undermines that policy.[4]

At the heart of this case is a taxpayer's entitlement to an ad valorem

exemption from property taxes, which emanates from the Florida Constitution.

Therefore, "[w]e are called on to construe the terms [of] the people, and we are to

effectuate from the people, and we are to effectuate their purpose from the words

employed in the document."  Ervin v. Collins, 85 So. 2d 852, 855 (Fla. 1956).  In so

doing, "[w]e are obligated to give effect to [the] language [of a constitutional

amendment] according to its meaning and what the people must have understood it to

mean when they approved it."  Benjamin v. Tandem Healthcare, Inc., 998 So. 2d 566,

570 (Fla. 2008) (second and third alterations in original) (quoting City of St. Petersburg

---

[4]"The public policy furthered by a homestead exemption is to 'promote the
stability and welfare of the state by securing to the householder a home, so that the
homeowner and his or her heirs may live beyond the reach of financial misfortune and
the demands of creditors who have given credit under such law.' "  Chames, 972 So. 2d
at 853-54 (quoting McKean v. Warburton, 919 So. 2d 341, 344 (Fla. 2005)).  "Those
aspects of homestead directed at property taxation provide financial relief for owners of
property who qualify for homestead status."  Kelly v. Spain, 160 So. 3d 78, 82 (Fla. 4th
DCA 2015).

v. Briley, Wild & Assocs., 239 So. 2d 817, 822 (Fla. 1970)).  As such, we begin with an analysis of the plain language of the applicable constitutional provisions.  Id.; see Endsley v. Broward County, 189 So. 3d 938, 941 (Fla. 4th DCA 2016) ("When construing a statute or constitutional provision, we should first look to the plain meaning of the words used.").  When the language of the constitutional provision is clear and unambiguous and conveys a clear and definite meaning, the constitutional provision must be given its plain and obvious meaning.  Endsley, 189 So. 3d at 941.

With these fundamental principles in mind, we now examine the applicable constitutional provisions.  First, the Florida Constitution provides that [e]very person who has the legal or equitable title to real estate and maintains thereon the permanent residence of the owner, or another legally or naturally dependent upon the owner, shall be exempt from taxation thereon . . . upon establishment of right thereto in the manner prescribed by law.  Art. VII, § 6(a), Fla. Const. (emphasis added).  Here, the Baldwins owned legal title to the real estate for which they are claiming an exemption.  They are accordingly entitled to an exemption if they "maintain[ed] thereon" their "permanent residence."

We first address what it means to "maintain" the permanent residence of the owner.  Because the word "maintain" is not defined in the constitution or the statutes implementing the provision, we find it instructive, but not necessarily dispositive, to consult dictionary definitions to discern its plain and ordinary meaning.  See Jefferson v. State, 264 So. 3d 1019, 1026 (Fla. 2d DCA 2018).  "[M]aintain" is defined as "[t]o continue in possession of (property, etc.)," and "[t]o care for (property) for purposes of operational productivity or appearance; to engage in general repair and upkeep."

- 8 -

Maintain, Black's Law Dictionary (10th ed. 2014); see also The American Heritage Dictionary, 1058 (10th ed. 2014) (defining "maintain" as "[t]o keep in an existing state; preserve or retain" and "[t]o keep in a condition of good repair or efficiency"). Obviously, the thing which one "preserves" or "continue[s] in possession of"—the residence—must already be in existence before it can be maintained. One cannot keep "in a condition of good repair" a residence that has not yet been constructed. In other words, the plain and ordinary language of our constitution leads us to the inescapable conclusion that a taxpayer cannot "maintain" or "continue in possession of" his or her "residence" until the property that he or she is "maintaining" actually constitutes the taxpayer's "residence." Here, the Baldwins never maintained their residence on the subject property until the new structure was completed in June 2015.

Next, we turn to the plain and ordinary meaning of the constitutional phrase "permanent residence." Although the Florida Legislature has defined "permanent residence" in the statutes implementing this constitutional provision, see § 196.012(17), Fla. Stat. (2014), we examine the text of this self-executing constitutional provision to discern its plain and ordinary meaning, see Zingale, 885 So. 2d at 282 ("Any inquiry into the proper interpretation of a constitutional provision must begin with an examination of that provision's explicit language." (quoting Caribbean Conservation Corp. v. Fla. Fish & Wildlife Conservation Comm'n, 838 So. 2d 492, 501 (Fla. 2003))); see also Fla. Dep't of Rev. v. City of Gainesville, 918 So. 2d 250, 257 (Fla. 2005) ("[T]he

statutory definition does not control the construction of the term 'municipal or public purposes' in the constitutional provision.").[5]

"Residence" is defined in part as "bodily presence as an inhabitant in a given place."  Residence, Black's Law Dictionary (10th ed. 2014) (emphasis added); see also The American Heritage Dictionary, 1493 (10th ed. 2014) (defining "residence" as "[t]he place in which one lives; a dwelling").  Thus, the plain and ordinary understanding of the word "residence" means "a dwelling" in which one has "bodily presence as an inhabitant."  A not-yet-completed structure that has never been physically occupied by the owner does not fit within this plain and ordinary understanding of the term "residence."  There is one modifier of the term "residence" in the provision—the residence must be the taxpayer's "permanent" residence.  "Permanent" is defined as "[n]ot expected to change in status, condition, or place." Permanent, The American Heritage Dictionary, 1314 (10th ed. 2014).  Therefore, the structure that the taxpayer inhabits must not change in "status" as the taxpayer's home.  Here, before the residence for which the Baldwins are claiming an exemption can become the Baldwins' "permanent residence," the Baldwins must physically live in a dwelling on the property.  However, the Baldwins did not physically live in a dwelling on the subject property until June 11, 2015.

---

[5]Although instructive, we are not bound by the definition of "permanent residence" provided by the legislature.  This is because article VII, section 6(a) is self-executing, and as such, we do not need the legislature's aid to discern its meaning. See Gray v. Bryant, 125 So. 2d 846, 851 (Fla. 1960) (defining a self-executing provision of the Florida Constitution as one which "lays down a sufficient rule by means of which the right . . . may be determined, enjoyed or protected without the aid of legislative enactment"); see also Gainesville, 918 So. 2d at 257 (explaining that the supreme court is not bound by the legislature's definition of a self-executing constitutional provision).

Further, though not dispositive in our analysis of this self-executing constitutional provision, the Florida Legislature defines "permanent residence" as

> that place where a person has his or her true, fixed, and permanent home and principal establishment to which, whenever absent, he or she has the intention of returning. A person may have only one permanent residence at a time; and, once a permanent residence is established in a foreign state or country, it is presumed to continue until the person shows that a change has occurred.

§ 196.012(17); see also Karayianakis, 23 So. 3d at 846 ("The Florida Legislature's construction of these constitutional provisions guides our analysis."). This definition is consistent with the plain and ordinary understanding of the phrase as it is used in the constitutional provision passed by the people of our state. The legislature's use of the word "establishment," again, suggests a dwelling that the homeowner physically occupies. See The American Heritage Dictionary, 608 (10th ed. 2014) (defining "establishment" as "[a] place of residence or business with its possessions and staff"). Because taxpayers may reside in multiple structures, the definition explains that the residence must be "permanent" in that it is the place that the taxpayer "has the intention of returning" "whenever absent." § 196.012(17).

Accordingly, based on the plain and ordinary meaning of the constitutional provision providing the homestead exemption, to "maintain" "the permanent residence" on a piece of property, a taxpayer must preserve and continue in possession of a dwelling that the taxpayer physically occupies as a home and intends to return to whenever absent. Based on the plain and ordinary meaning of the operative constitutional provision, we are compelled to hold that the Baldwins are not entitled to a homestead exemption for their residential property for tax year 2015 because they did

- 11 -

not maintain their permanent residence on the property until June 11, 2015, the date that they moved onto the subject property and the first time they physically occupied a house on that property. Cf. Dep't of Rev. v. Pelsey, 779 So. 2d 629, 632 (Fla. 1st DCA 2001) ("[A]ctual occupancy is essential to a homestead claim."). Because they are not entitled to a homestead exemption for tax year 2015, they are also not entitled to a transfer of the homestead assessment difference.

This conclusion is not contradicted by the supreme court's holding in Semple or Florida's public policy of preserving the home. In Semple, the supreme court emphasized that the homestead character will attach to property where the owner manifests an intention to "occupy the premises immediately as a home." 89 So. at 639 (emphasis added). In emphasizing the intent aspect of the Semple court's holding, the Baldwins ignored the temporal component. The Baldwins clearly intended to occupy the premises as a home, but only at some undeterminable point in the future after construction was completed. Because the Baldwins did not use or occupy the property as a home until six months into the year for which they were claiming the exemption, they did not manifest an intent to "occupy the premises immediately as a home." Id. at 639 (concluding that homestead character did not attach to property where the property was not "in the actual use and occupancy" of the person claiming homestead exemption until "two months after" the date on which the property was conveyed by deed); cf. § 196.031(1)(a) ("A person who, on January 1, has the legal title or beneficial title in equity to real property in this state and who in good faith makes the property his or her permanent residence . . . is entitled to an exemption from all taxation . . . ." (emphasis added)); see also Clements v. Farhood, No. 5:17CV213-RH/GRJ, 2018 WL 850086, at

- 12 -

*2 (N.D. Fla. Feb. 12, 2018) ("[Semple] is still cited from time to time, but never for the proposition that a lot without a livable residence can be homestead if only the owner intends to build a house and live there at some point in the future.").

As for the Baldwins' reliance on Florida's public policy to protect the home, the Florida Constitution "[d]oes not establish an absolute right to a homestead exemption." Horne v. Markham, 288 So. 2d 196, 199 (Fla. 1973). Indeed, the constitutional provision affords the right only to those who establish the right "in the manner prescribed by law." Art. VII, § 6(a), Fla. Const. Further, this policy is less compelling in the context of providing a homeowner an exemption from taxes than in the context of protecting a homeowner from a forced sale of his or her property. See S. Walls, Inc. v. Stilwell Corp., 810 So. 2d 566, 571 (Fla. 5th DCA 2002) ("The public policy underlying the homestead exemption from forced sale is clearly more compelling than the public policy underlying the tax exemption. The homestead exemption should ensure more protection from forced sale than it receives from the tax exemption." (quoting In re Dean, 177 B.R. 727, 730 (Bankr. S.D. Fla. 1995))). Finally, where we can discern the constitutional provision's plain, ordinary, and unambiguous meaning, we cannot modify the will of the people in their passage of the constitutional provision based on policy considerations. Cf. McDonald v. Ronald, 65 So. 2d 12, 14 (Fla. 1953) ("Where the legislature's intention is clearly discernible, the court's duty is to declare it as it finds it, and it may not modify it or shade it, out of any consideration of policy or regard for untoward consequences.").

We stress that our holding today is limited to the facts of this case. See § 196.015 ("Intention to establish a permanent residence in this state is a factual

- 13 -

determination to be made, in the first instance, by the property appraiser."). We sympathize with the Baldwins' loss of the homestead portability benefit due to circumstances largely beyond their control. This court is mindful of the financial implications of this decision to the Baldwin family. The text of our constitution passed by the people of our state, however, compels this decision.

In summary, because the Baldwins did not maintain the subject property as their permanent residence on January 1, 2015, they are not entitled to a homestead tax exemption on the property for tax year 2015. Because they do not qualify for the homestead exemption, they also are not entitled to a transfer of their homestead portability benefit. We affirm the trial court's grant of final summary judgment in favor of the Property Appraiser.

Affirmed.

LaROSE, J., Concurs.
CASANUEVA, J., Concurs with opinion.

CASANUEVA, Judge, Concurring.

I fully concur with the court's opinion. I write only as a point of caution for those who may be impacted by this decision directly or indirectly, including building contractors, property owners, and practitioners representing them, who may wish to address in their contracts the potential impact of a construction delay on the Save Our Homes benefit.

This case illustrates an issue that may result from an extended construction period where a homeowner decides, often for economic reasons, to sell one homestead property prior to constructing or remodeling a new homestead residence. In this case, that extended construction period prevented the Baldwins from transferring the Save Our Homes benefit to their new home, despite their continued intent to establish it as their homestead.

One would be hard pressed to list all possible points of construction delay that could occur between permitting and a certificate of occupancy. As one example, our state, being a peninsula surrounded by the Atlantic Ocean and the Gulf of Mexico, is often the site of hurricane landfalls. Floridians know that a shortage of building supplies can result from multiple hurricane landfalls. In 2004, our state was buffeted by several hurricanes, and construction was severely impacted. An aerial view of our state demonstrated the proliferation of roof tarps of differing hues.

Interruptions causing construction to extend beyond the anticipated completion date can and do occur.[6] Understanding this reality, builders and

_____

[6]The Baldwins' affidavits state that their agreement with the builder contained a requirement that a certificate of occupancy be issued by December 22,

- 15 -

practitioners may be wise to consider this eventuality in the construction contract, where the risk of loss can be addressed, particularly keeping in mind the potential loss of a taxpayer benefit.

---

2014, but it became evident in the Fall of 2014 that the new house would not be completed by the end of 2014.